RE...
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS IN AND FOR
THE NINTH CIRCUIT

JAN 13 2014

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 13-30000 |
| Plaintiff-Appellee, | LETTER/MOTION FOR LEAVE TO FILE SUPPLEMENTAL EXHIBIT TO "MOTION FOR NEW COUNSEL AND TO URGE BOTH MOTIONS BE GRANTED" FILED AT DKT. _____ |
| v. | |
| Francis Schaeffer Cox, | |
| Defendant-Appellant | |

FILED _____
DOCKETED _____
DATE _____ INITIAL

January 7th 2014

Dear Court Administrator:

   Appellant respectfully requests leave of the Court to file the attached Bar Complaint and Letter to Mrs. Elliott as a supplemental exhibit to Appellant's "Motion For New Counsel and to Urge BOTH Motions [For Stay and Remand pending before the Court] Be Granted" filed at DKT. ____ on December ____, 2013.

                          Sincerely,

                          F. Schaeffer Cox, #16179-006
                          USP Marion
                          PO Box 1000
                          MARION, IL  62959-7500

IN THE UNITED STATES COURT OF APPEALS
FOR THE 9TH CIRCUIT

UNITED STATES OF AMERICA

    v.                           Appeal No. 13-30000

F. Schaeffer Cox

### CERTIFICATE OF SERVICE AND VERIFICATION OF FACTS

    COMES NOW F. Schaeffer Cox, being a natural citizen of the United States, over the age of majority, and subject to penalty of perjury under 28 USC §1746, and as an incarcerated indigent prisoner, proceeding in propia persona, pursuant to F.R.A.P. 4(c), Houston v. Lack, 108 S.Ct. 2379 (1998) and so certify that the facts presented in my attached Letter/Motion For Leave To File Supplemental Exhibit, along with the Supplemental Exhibit itself, are true and correct to the best of my knowledge and beliefs;

    FURTHER, I so certify I have sent an original and three (3) true copies thereof to the Clerk of Court for this U.S. Court of Appeals of the 9th Circuit, and a true copy to the Hon. U.S. Attorney Karen L. Loeffler and to appointed appellate counsel Suzanne Elliott, all correctly addressed with proper U.S. First Class Postage duly affixed thereto for posting in the U.S. First Class mailing by personally delivering same to Henry Rivas or Mr. Burgess for proper Legal Mail posting as per federal BOP Policy, that same is filed once delivered to proper FBOP officials on this 8th Day of January 2014.

    So swear I, under penalty of perjury.

                                F. Schaeffer Cox, pro se
                                FBOP Reg. No. 16179-006
                                U.S. Penitentiary -- Marion
                                P.O. Box 1000
                                Marion, Illinois   62959

Sworn & Attested below
to be my thumb print
in absence of a notary.

    Thumb print of
    Schaeffer Cox

Supplemental Exhibit

To "Motion For New Counsel

And To Urge

<u>BOTH</u> Motions Be Granted"

Part 1

Francis Schaeffer Cox, 16179-006
USP Marion CMU
PO Box 1000
Marion, IL    62959

Office of Disciplinary Counsel
Washington State
Bar Association
1325 4th Avenue, Suite 600
Seattle, WA    98101-2539                    January 2nd 2014

    Re:  Grievance Against Mrs. Suzanne Lee Elliott, WSBA #12634

Dear Disciplinary Counsel:

    Please find enclosed a copy of the letter I sent to Mrs.
Elliott regarding her ethics violations and violations of the
rules of professional conduct.

    I ask that you treat this letter as a preliminary complaint
and send me the Washington Bar Association's rules of professional
conduct as well as the proper forms to further establish my
complaint.  Upon receipt of proper forms and reference material,
I will file a superseding grievance that more pointedly addresses
Mrs. Elliott's professional misconduct.

                        Respectfully,

                        F.A. Schaeffer Cox

Supplemental Exhibit

Part 2

Francis Schaeffer Cox
Reg. No. 16179-006
U.S. Penitentiary - Marion
P.O. Box 1000
Marion, IL  62959
January 2, 2014

Ms. Suzanne Elliott, Esq.
Attorney at Law
1300 Hoge Bldg.
705 2nd Avenue
Seattle, WA  98104

             In Re:  USA v. Schaeffer Cox
                     9th Cir. App. No. 13-30000

Dear Ms. Elliott:

     I am in receipt of your "Motion to Stay and Remand For
Competency Hearing" and I am in receipt of your "Response to Dkt.
23, Government's Motion For Clarification."

     I have not received a copy of the "Government's Motion For
Clarification."  Therefore, I do not know if the government's
Motion For Clarification was in regard to your Motion For Stay
and Remand For Competency Hearing or in regard to my Motion For
Stay, Motion to Order Government to Disclose All Brady-Giglio-
Kyles Material and a Hearing Thereon and my Motion to Appoint
New Counsel.

     You will please note attached hereto is a copy of my letter
to the 9th Circuit Court of Appeals Court Administrator complaining
of your failure to provide service to me and requesting that the
Court require both you and the government perform service to me
based on our now adversarial positions.  Exhibit A.

     I was astounded to read at lines 11-13 that I was quoted in
a news article as stating, "I feigned mental illness in my pre-
sentence mental evaluation."  Why would you not first ask me if I
made such a statement?  I did not say that.  It is a mischaracter-
ization taken out of context.

     I said, as I have previously, I was in an altered state of
mind due to my panicked-fearful response to the federal prosecutorial
team.  To wit:  Joseph W. Bottini, AUSA; Nicholas A. Marsh [deceased],
AUSA; Steven Skrocki, AUSA; James A. Groeke, AUSA; Yvonne Lamoureux,
AUSA 2nd; then law enforcement investigative team among others; to
wit:  FBI Special Agent Sandi Klein, FBI Special Agent Richard Suther-
land, and then confidential informants, Aaron Bennett, Bill Fulton,
and J.R. Olson, who ran their multimillion dollar 3 year long sting
in an effort to provoke me into committing violent unlawful acts out
of my fear of being harmed by the undercover CI's posing as militia
members.  It was FBI Agent or Agents, improperly supervised by the

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 2

prosecution-investigative team, who orchestrated, promoted, and utilized the threats made by the CI's and or federal agents to make me fearful for myself and family and friends. (See Exhibit B)

You are well aware it is documented Aaron Bennett urged me to commit violent acts and I distanced myself from him. You are well aware that it is documented that CI Bill Fulton made violent threats to kill me and my friend Les Zerbe, because we had no plan to commit violent acts, while brandishing a knife and holding it to Les Zerbe's throat.

You are well aware that a credible member of the armed forces, and the Military Police at Fort Wainwright, Steve Gibson (who never met me), after being approached by a U.S. Marshal and an FBI agent was so concerned by their conversations, about hoping I would resist arrest and could be killed, that he looked me up and personally warned me my life may be in danger.

You are well aware that the joint defense team's audio tape expert told the defense that he believed the recordings had been altered and edited but to prove it he needed access to the original tapes, before they were reformatted. You are aware prosecutor Steven Skrocki misled the court, misstating the copy the defense had was the same as the original and this was a defense effort to delay trial. The trial court then denied our request preventing our expert from being able to testify in our behalf.

You should be aware that the "phantom hit squad" was foisted on me by the CI's in this case.

Yet you have presented these issues as if they are delusions from what must be my mental illness.

Also you have cherry picked Ms. Robin LaDue's evaluation, ignoring where she defined "Diagnostic Criteria For 301.0 Paranoid Personality Disorder."

"1. Suspects, <u>without sufficient basis</u>, that others are exploiting, harming, deceiving him or her;
(2) is preoccupied with **unjustified doubts** . . .
(3) is reluctant to confide in others because of "unwarranted fear" . . .

You have ignored where the evaluator stated:

". . . as well as an intense reaction to a perceived situational threats. This appears to have been the situation with Mr. Cox and the federal government . . . and the government informants."

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 3

      "In this case, it is difficult to ascertain whether
he [Mr. Cox] has schizophrenia and/or paranoid and
delusional disorders due to an ongoing involvement
of others that supported his "delusions" . . ."

      "He [Mr. Cox] needs to be protected from people who
instigated and supported his delusions . . ."

    You have totally ignored Peter Camiel's sentencing memorandum
including the following at page 9:

      ". . . Finally the influence of government informants
played a key role.  The more the government informant
instigated Mr. Cox, the more paranoid . . . he became."

    You have totally ignored Peter Camiel's sentencing reports
from Page 9, "Overview of the Charged Counts," pg 9-10; the KJNP
Security Detail, pg 10-11; the 241 Plan, pg 11-18; Schaeffer Cox
Fear of the Government, pg. 19-20; Schaeffer Cox's Fear of Bill
Fulton, pg. 20-24; The Conditional Nature of the Conspiracy and
Solicitation to Murder Federal Officials, pgs. 24-26; Sentencing
Entrapment, pgs. 38-41.  (See:  attached Exhibit _B_)

    Peter Camiel's sentencing memorandum clearly states there was/
is a basis for my fear/paranoia that was induced by the prosecutorial
and law enforcement team during the Polar Pen Task Force investiga-
tion.

    You have characterized me as falsely attacking/hating U.S.
Government in your pleadings.  This is untrue.  I have at times
opposed U.S. policies.  I believe in working within our system.
I have memorized our Constitution.  I ran for Public Office.  It
is the U.S. Judicial System, the Circuit Judges on the 9th Circuit,
to whom I am trusting to provide relief from an unjust conviction.

    I am trusting in the DOJ and their office of Professional
Responsibility, their Division of Public integrity, and their
Office of the Inspector General.  I have asked you to help me
present my complaints against Joseph W. Bottini, James Groeke,
Nicholas Marsh, Steven Skrocki, Yvonne Lamoureux, and their Polar
Pen law enforcement agents regarding their violations of rules,
policies, ethics, and laws in mine and other cases.

    When I asked for your help you replied in your letter to me
of July 23, 2013, "I do not believe an appeal to anyone in Washington,
D.C. will assist you. (Page 2) Exhibit C.

    You further stated that:

      ". . . a direct appeal is based _solely_ on the evidence
admitted at trial or testified by the witnesses.  If it

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 4

> was not admitted at trial, it is as if it never happened.
> You cannot take evidence outside the record and now
> insert it into the proceedings." (See Exhibit C)

In July I accepted your words at face value, albeit I was
raising this in the context of evidence outside the record because
the trial court ruled it inadmissible, and would not admit my
statements made while I was unknowingly recorded by CI's or when
I gave an 8 hour uncounseled statement to the FBI. This based on the
Polar Pen prosecution team's motions to keep my state of mind/mens
rea statements corroborating my trial testimony out of court, as
well as the original non-edited version tapes of the government's
recordings.

Since then, I have found numerous cases in the 9th Circuit and
elsewhere where precisely such non-admitted evidence - not admitted
at trial is the subject of successful appeals. I feel you misled
me on this matter (See: Exhibit D state of mind cases and review
thereof).

I wrote you that the prosecutors knew their CI's were being
untruthful and that the prosecutors knew I testified truthfully at
trial, and that was the same thing I said when being recorded
without my knowledge, when I gave an 8 hour uncounseled statement
to the FBI which the prosecutors were able to suppress. Further
I told you the prosecutors did not correct the perjury of their
witness and instead bolstered and vouched for them in closing
argument while falsely telling the jury my testimony was a fabrica-
tion and I believed this was outrageous prosecutorial misconduct.

In your letter of September 16, 2013, you replied stating in
part:

> "If there are Brady violations apparent from the record,
> as presently developed, then we can certainly raise
> arguments about the government's failure to provide you
> with all of the exculpatory evidence in the case. But
> I caution you that while you believe some of the witnesses
> testimony was 'perjurious,' the government's point of
> view is that these witnesses were telling the truth." (Exh.C)

Why were you so quick to tell me that the government (ergo:
the Polar Pen prosecution) believed that their witnesses were telling
the truth, instead of knowingly allowing perjurious testimony to
go to the jury uncorrected that the prosecutors vouched for and
bolstered during closing argument? Why would you not think it was
possible that the prosecutor violated court ethics by knowingly
making false statements to the tribunal and the jury, in telling
the jury during closing arguments:

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 5

> "Schaeffer Cox tells ... Lonnie Vernon ... 'But Bill
> Fulton, I'm afraid is going to kill me ... Aaron
> Bennett, I'm afraid is trying to kill me.'  I submit
> to you folks, ... you try to find a statement anywhere
> about, 'Bill Fulton's trying to kill me, Aaron
> Bennett's trying to kill me.'  You can look through
> 900 pages of it, you're not going to find it. ...
> But the deal is you're not going to find any evidence
> except what this guy [Cox] said on the stand last week,
> that Bill Fulton and Aaron Bennett were out to kill him.
> ... Frankly folks, he [Cox] lied to you. ... he's lying
> to you. ... We call baloney on that ..."

I don't have the Alaskan or Washington Bar Association Rules
or Washington or Alaskan district court's Rules of Professional
Conduct but I have the Washington, D.C.'s Rules of Professional
Conduct and Rule 3.3(2) is:  Prohibits an attorney from making a
false statement of material fact or law to a tribunal.

Further, given that Washington, D.C. District Judge, the Hon. Judge
Emmet G. Sullivan stated, found at 715 F.Supp.2d 1 (USDC Wash.D.C.
2009) the following:

> "On December 11, 2008, the government filed under seal a
> copy of a complaint made by an FBI agent assigned to the
> investigation and trial of the defendant, Senator Ted
> Stevens.  In the complaint, the agent states that as the
> co-case agent on the Stevens investigation, he "witnessed
> or learned of serious violations of policy, rules, and
> procedures as well as possible criminal violations."  The
> complaint alleges, among other things, that prosecutors
> on the case schemed to relocate a government witness, who
> had been subpoenaed by both the government and the
> defendant, in order to avoid having that witness testify
> at the trial; attempted to conceal exculpatory information
> from the defendant; and mishandled evidence.  The complaint
> also alleges that the lead FBI agent in charge of the
> investigation fostered an inappropriate relationship with
> the government's main witness; intentionally redacted
> exculpatory information from a document turned over to
> the defendant, in order to make that document "fit" with
> information previously provided to the defendant; and
> violated numerous rules and regulations, including dis-
> closing to a source that another source had testified
> before the Grand Jury. ...
>
> In the face of what appears to be another incident in an
> ongoing series of incidents in which the Court has relied
> on information provided by the government only to later
> learn that the government had misled the Court and/or

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 6

      misrepresented the facts, the Court sought an explanation
      from officials at the Department of Justice ... ."

and at: <u>In Re Special Proceedings</u>, 842 F.Supp.2d 232 (USDC Wash.D.C.
2012) the following:

      "Meanwhile, in the face of serious and mounting allegations
      of prosecutorial misconduct throughout the trial and
      post-trial proceedings, the attorneys repeatedly represented
      to the Court and to the <u>public</u> that there was no wrongdoing
      and no cause to question the integrity of either the
      indictment or the verdict.  Only when faced with uncontro-
      verted evidence that the attorneys had committed <u>Brady</u>
      violations did the government come before the Court and
      publicly move to dismiss the indictment and vacate the
      verdict.  And only at that point did the government seek
      to turn this <u>public</u> proceeding into a private one, assuring
      the Court that it would investigate the prosecutors internally
      through its confidential Office of Professional Responsibility
      process. ...

      On November 21, 2011, the Court issued an Order indicating,
      <u>inter</u> <u>alia</u>, that Mr. Schuelke had informed the Court that
      his investigation was concluded and had submitted a five-
      hundred-page report to the Court <u>in camera</u>.  Order Regarding
      Report of Henry F. Schuelke, III, and Setting Forth Instru-
      ctions for Further Proceedings at 12 ("November 21, 2011
      Order").  The Court's Order went on to note that based on
      their exhaustive investigation, Mr. Schuelke and his esteemed
      colleague, Mr. William B. Shields, had concluded that the
      investigation and prosecution of Senator Stevens were
      "permeated by the systematic concealment of significant
      exculpatory evidence which would have independently cor-
      roborated [his] defense and his testimony, and seriously
      damaged the testimony and credibility of the government's
      key witness." <u>Id</u>. at 3 (citing Mr. Schuelke's Report). ...

      After a highly publicized trial and months of post-trial
      proceedings during which the prosecution team repeatedly
      denied any wrongdoing and zealously defended the guilty
      verdict it had obtained, the opposing attorneys cannot now
      circumvent the First Amendment and any public accountability
      by relying on the government's eleventh-hour motion to
      dismiss the indictment with prejudice. ...

      In response to those arguments, the subject attorneys
      repeatedly responded that the mistakes were "unintentional,"
      "inadvertent," and/or "immaterial."  For example, when the
      government failed to produce the exculpatory grand jury
      testimony of prospective government witness Rocky Williams,

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 7

the prosecutors claimed that the testimony was immaterial.
See Gov't's Opp'n to Def.'s Mot. to Dismiss or for New
Trial, Stevens (Sept. 29, 2008). When the government sent
Mr. Williams back to Alaska without first advising the
defense or the Court, the prosecutors asserted that they
were acting in "good faith." Trial Transcript, Oct. 2,
2008, p.m., at 42. When government counsel told the Court
that the government's key witness, Bill Allen, had not
been re-interviewed the day before the hearing on its
Brady disclosures, this was a "mistaken understanding."
Gov't's Opp'n to Def.'s Motion to Dismiss Due to Alleged
Misconduct at 15 (Oct. 6, 2008). When the government
failed to turn over exculpatory statements from Dave
Anderson, another government witness, the prosecutors
claimed that the statements were immaterial. Trial Trans-
cript, Oct. 8, 2008, p.m. at 58, 62, 64, 67. When the
government failed to turn over a grand jury transcript
containing exculpatory information, the prosecutors claimed
that it was "inadvertent." Trial Transcript, Oct. 6, 2008,
p.m. at 95. When the government used "business records"
that the government knew to be false, the prosecutors said
that it was unintentional. Trial Transcript, Oct. 8, 2008,
p.m. at 76. When the government failed to produce the
bank records of Bill Allen and then surprised the defense
at trial with Bill Allen's check, it claimed that this,
too, was immaterial to the defense. Trial Transcript, Oct.
8, 2008, a.m. at 3.

Notwithstanding mounting evidence to the contrary, the
Court accepted the prosecutors' representations and declined
to dismiss the case or declare a mistrial (though the Court
did take other steps to ameliorate the prejudice to the
defense). Had the Court known of the misconduct and the
information concealed by the government, as documented in
the Schuelke Report, those decisions would have been differ-
ent.

As the Court noted in its November 21, 2011 Order, Mr.
Schulke and Mr. Shields found that the investigation and
prosecution of Senator Stevens were "permeated by the
systematic concealment of significant exculpatory evidence
which would have independently corroborated [his] defense
and his testimony, and seriously damaged the testimony and
credibility of the government's key witness." See Nov. 21,
2011 Order at 3 (quotong Mr. Schuelke's Report at 1). Mr.
Schuelke and Mr. Shields found that at least some of this
concealment was willful and intentional, and related to
many of the issues raised by the defense during the course
of the Stevens trial. In addition, they found evidence of
concealment and misconduct previously unknown to the Court

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 8

and to the defense, even after the government moved to
dismiss the indictment.  For these reasons, access to
the Report would certainly play a positive role in informing
the public of the flaws in the criminal trial of Senator
Stevens. ...

It is also significant to this analysis that the information
revealed as a result of the government's motion to dismiss
the indictment and vacate the verdict in the Stevens case,
and this Court's decision to appoint Mr. Schuelke to inves-
tigate the subject attorneys, had dramatic implications for
two other individuals convicted by the Public Integrity
Section as part of the "Polar Pen Investigation" of Alaska
political corruption.  Peter Kott, former Speaker of the
Alaska House of Representatives, and Victor H. Kohring, a
former member of the Alaska House of Representatives, had
been convicted and were serving prison sentences on bribery
and extortion-related charges when the government moved to
dismiss the Stevens case and the Court appointed Mr. Schuelke.
Because of these events, in April 2009, Mr. Kott and Mr.
Kohring moved for release from custody and for disclosure
of all Brady material in their own cases.  In June 2009,
the government uncovered Brady material in both cases and
asked the Ninth Circuit to remand the cases to the District
Court of Alaska and to immediately release Kott and Kohring
on personal recognizance.  The Ninth Circuit granted the
requested relief.  See Order, U.S. v. Kohring, 334 Fed.Appx.
836 (9th Cir. 2009) Doc. No. 41; Order, U.S. v. Kott, 333
Fed. Appx. 204 (9th Cir. 2009) Doc. No. 59.  In March 2011,
the Ninth Circuit found that information suppressed by the
government in both cases was favorable and material to the
defense and that the prosecution violated Brady and Giglio
v. United States, 405 U.S. 150, 92 S.Ct. 763. 31 L.Ed.2d
104 (1972).  The Court of Appeals vacated the convictions
and remanded the cases to the District Court for new trials.
See United States v. Kohring, 637 F.3d 895 (9th Cir. 2011);
United States v. Kott, 423 F.App'x 736 (9th Cir. 2011).  On
October 21, 2011, both men pleaded guilty and were sentenced
to time served.  Richard Mauer, Corruption Trials Ended;
Kott, Kohring Plead Guilty, Sentenced to Time Served, Anchor-
age Daily News (Oct.22, 2011)."

and in U.S. v. Peter Kott, 423 Fed.Appx. 736 at pg. 738, U.S. Circuit
Judge, the Hon. Betty Fletcher, in her dissent stated:

"I am deeply troubled by the government's lack of contrition
in this case.  Despite their assurances that they take this
matter seriously, the government attorneys have attempted
to minimize the extent and seriousness of the prosecutorial
misconduct and even assert that Kott received a fair trial -
despite the government's failure to disclose thousands of

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 9

pages that reveal, in part, prior inconsistent statements by the government's star witnesses, Bill Allen and Rick Smith, regarding the payments Kott allegedly received. The undisclosed pages also reveal an ongoing investigation of Allen for sexual exploitation of minors and his attempts to suborn perjurious testimony from one of the minors, and information regarding Smith's questionable mental health around the time of Kott's trial. The government's stance on appeal leads me to conclude that it still has failed to fully grasp the egregiousness of its misconduct, as well as the importance of its constitutionally imposed discovery obligations. Because a new trial, in my view, is insufficient to remedy the violation of Kott's constitutional right to a fair trial and to deter future illegal conduct, I would exercise our supervisory authority to dismiss the indictment with prejudice."

Given the above, you replied to my <u>Brady</u> outrageous misconduct concerns in your letter of Sept. 16, 2013 previously cited and in your letter of Sept. 3, 2013 wherein you stated:

"... I believe the first four likely have legs in the appeal. As to number 5, 'Outrageous Government Misconduct,' we would have a difficult time prevailing on that theory. ... Absent the revelation of some huge <u>Brady</u> violation or other truly outrageous conduct ... that issue probably does not have legs." (See Exhibit C)

I had no knowledge of the Kott, Kohring, or Weyhrancher cases, but I'm certain you did. You knew that their counsel successfully moved the 9th Circuit for a remand for a hearing on Brady-Giglio-Kyles violations to expand the record.

The <u>Brady</u> violations that happened in the other cases around the same time as mine, pale in comparison to the AUSA's refusal to disclose Bennett's role as a CI or to turn over the evidence he produced over his 4 years of involvment.

From the start of your appointment as appellant counsel, I have advised that: (1) I wanted to raise issues surrounding the Frank's Hearing and the trial court's decision to not suppress the evidence in the trailer, and allow its admission along with the inculpatory portion of the "improperly edited/altered" tapes. I believe this was clear error and abuse of the Judge's discretion; (2) that the District Court erred when it ruled to suppress exculpatory recordings made by the FBI that clearly showed my state of mind, lack of intent and unwillingness to plot a crime. This suppression barred our whole defense and deprived me of due process; (3) that there were/are

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 10

estoppel arguments to my firearm charges.  There was evidence to
establish that I had gone to the local ATF office and inquired as
to whether or not I needed a tax stamp on a homemade WWII replica
gun and that I was acting in good faith upon what I was told.  I
believe it is clear error for the trial judge to deny our pretrial
motions on this, citing that it was a question for the jury, and
then at trial to bar any argument regarding that defense to the
jury he ostensibly had deferred to earlier; (4) that there are
colorable arguments to be made on the conspiracy charges, as to
the conditional nature of the conspiracy, with no real viable
object (those arguments put forth by Peter Camiel in his sentencing
memorandum), and those put forth by Robert John, Esq. in his letter
to and conversations with you; (5) the prosecutorial/law enforcement
misconduct issues of improperly supervising their confidential
informants (a) allowing them to use threats of force, bodily harm,
or death and actual physical violence with a knife to try to coerce
me into committing a crime or crimes, (b) continuing the undercover
sting for 3 years when I repeatedly refused to engage in or agree
to acts of violence, (c) failures to disclose Brady-Giglio-Kyles
material, including improper relationships between the FBI Agents and
their CI's, (d) editing/altering the audio tapes, (e) making clearly
false statements in the arrest/search warrants and to the grand jury,
(f) concealing that Aaron Bennett was an ATF informant and the
prosecutor's CI, allowing Bennett to become an enemy agent inserted
in the defense camp, by meeting repeatedly with my investigator
Rolly Port, meeting with defense counsel repeatedly, and testifying
as a defense witness while being a government informant/operative
who probably recorded me for the government and those tapes were
suppressed, (g) that the government suppressed 302's, debriefing of
Aaron Bennett, as to those conversations, meetings with me, with my
Investigator and attorney if not attorneys, (h) the AUSA's engaged
in obstruction of justice when the defense investigator Rolly Port
asked for audios made by CI Bill Fulton and rather than turn over
the requested audios the AUSA's turned them over to CI Bill Fulton
who subsequently destroyed them, or so we are told.

     For the year you've been my appellant counsel, you've never
told me the issues you wanted to raise or how.  You never gave me
any case law as to how the Ninth Circuit has ruled on similar facts
and law as to the issues I wanted raised.

     I have access to an electronic LEXIS-NEXUS law library.  I know
how to Sheppardize and do basic research.  The only issue you've
really said you wanted to raise was my mental competency, which I've
repeatedly told you I didn't want to raise and why.  (See Exhibit  C  )

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 11

You have never been precise in the issues we should raise, or
given me any case law supporting those issues, and conversely you
have never given me any specifics that were accurate as to why the
issues I wanted to appeal on were losers.  You never gave me any
cases I could look up and see "you're right,  that appeal issue
won't fly; there is Ninth Circuit precedent against it."

I never asked you to send me to law school, but you have
abjectly failed to keep me even reasonably informed when I could
make an informed decision.  We've talked 30 minutes in a year.

Two deadlines for the original brief passed and I never saw
your draft brief until I visited with Robert John, Esq., on Dec.
30, 2013.

It was approximately 700 sentences out of 1300 allowed, or
approximately 7500 words out of 14,000 allowed.

You never asked me, but abandoned any appeals of the Firearms
convictions, where on some I'm serving 10 years.  The issues you
abandoned included the Frank's Hearing and suppression or estoppel
issues, which all my other lawyers felt were winnable.

You didn't raise or brief the conspiracy issues raised by
Robert John or Peter Camiel.  Instead, you raised only a jury
instruction issue, to which there was no objection at trial and as
such was not preserved, but you raised it as "plain error," a
very diffucult standard to overcome; while abandoning attacks on
the conspiracy to kill officials or solicit someone to do so, where
there were objections and preserved appeal issues.

Lastly, albeit I've repeatedly told you I did not want to raise
the mental illness issue on appeal, you spent a lot of time and space
on your statement of facts addressing/supporting that premise and
then raised it on direct appeal as ineffective assistance of Nelson
Traverso, without discussing this with me at all.

You never discussed what ramifications this might hold for me
in a later 2255 proceeding on this issue and/or other claims of IAC
against Mr. Traverso.  If the Ninth Circuit decides the record is
not complete enough as to the factual predicates of this claim,
would it procedurally bar me from re-raising it in district court?
Would it risk barring me from raising other separate IAC against
counsel Traverso which I believe exist?  Rolly Port and Tim Dooley,
Esq., both said they would give me affidavits as to his ineffective-
ness.

While there are risks to your unilateral decision to raise this
issue now as well as risks to being procedurally barred later in a

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 12

2255 on IAC against Mr. Traverso, there is no such risk of being
procedurally barred later by not raising it (the IAC claim in re
mental competence) on direct appeal.  See: Massaro v. United States,
155 L.Ed.2d 714 (2003) which held a defendant can't be later
procedurally barred on 2255 for failing to raise an ineffective
assistance of counsel issue on direct appeal.  Justice Kennedy
writing for a unanimous court:

> "Applying that rule to ineffective-assistance claims would
> create a risk that defendants would feel compelled to
> raise the issue before there has been an opportunity fully
> to develop the claim's factual predicate, and would raise
> the issue for the first time in a forum not best suited to
> assess those facts, even if the record contains some indi-
> cation of deficiencies in counsel's performance.  A §2255
> motion is preferable to direct appeal for deciding an
> ineffective-assistance claim.  When a claim is brought on
> direct appeal, appellate counsel and the court must pro-
> ceed on a trial record that is not developed precisely
> for, and is therefore often incomplete or inadequate for,
> the purpose of litigating or preserving the claim."

You yourself must feel the record lacks a successful factual
predicate to sustain this issue on direct appeal or you would not
have filed the Motion For Stay and Remand For Competency Hearings
Under 18 USC §4247.

I know I don't need to, nor could I, send you to law school,
but raising this now as IAC makes NO sense to me!

When you declined to help me on the Polar Pen misconduct, I
filed the pro se Motion To Stay, Motion For an Order to Require the
Prosecution To Disclose All Previously Withheld-Suppressed Brady-
Giglio-Kyles Materials, a Motion For Remand as in Kott and Kohring,
and Appointment Of New Counsel.

You appear to have been highly offended and thus, responded
with your Motion For Stay and Competency Hearing.

You seem to feel I must be mentally incompetent to dare to
challenge your appellate decisions.

You opined that since I tried to fire Mr. Traverso during trial,
I would just try and fire any newly appointed attorney as well.

Yet you were well aware that after paying Mr. Traverso over
$150,000, Mr. Traverso told me he would not attempt to introduce my
state of mind evidence or recordings of me refusing to plot a crime.
You will recall I objected personally to the trial court.  This is

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 13

why Mr. Port and Tim Dooley, Esq. offered to give me the affidavits
in support of Traverso's IAC. That was the core of my defense, my
state of mind, and would have corroborated my trial testimony.

Perhaps the FBI has the right to try to talk me into plotting
a crime. But I have the right to refuse. I have the right to not
be attacked with a knife for refusing. I have a right to not receive
ongoing death threat ultimatums from CI's. I have the right to leave
the country with my family to get away from ongoing death threat
ultimatums. I have the right to present evidence of my state of mind
and my effort to leave the country to a jury. So far none of those
rights have been respected. What could arguably be my last right left
is the right to have the appellate court review these violations of
my rights. And that is a right that you are not authorized to waive
for me, against my will and above my objections.

I will be perfectly satisfied with appellate counsel who will
raise the 5 issues I addressed in this letter.

You never talked to me about filing the Motion To Stay, and
Remand For Competency Hearing. You never spoke to my wife, mother,
father, sister, or brother before you filed it the same day you got
my Motion For Stay and Remand. You never spoke to Mr. John, or
Peter Camiel about this either.

You haven't read the discovery, reviewed the nonadmitted
evidence or given any consideration to Mr. Camiel's sentencing
memorandum. You have also refused to listen to Mr. John or make
any effort to obtain Mr. Port's reports. Had you done any of these
things you would have known that there was a factual basis for my
panicked reaction to the investigation's violent coercion.

You have ignored all that and instead told the Ninth Circuit
my testimony was delusional and based on my mental illness, which I
deny. This has the effect of calling my testimony falsified and
untruthful, without my permission.

That is not the conduct of my advocate but of my adversary.
This, along with your continued failure to keep me reasonably
informed, is one reason for the complaint I have filed against you
with the Washington Bar Association.

You have based your opinion on Ms. LaDue's evaluation. I can
discredit her professionally at any hearing, but if I told you what
I have, you and I both know you'd be on the phone to her trying to
warn her and neutralize it. Clearly you are no longer acting as
my advocate.

On a remand under 4247 I am entitled to appointment of counsel
to defend against your allegations of my incompetency. You cannot
wear both hats.

Ms. Suzanne Elliott, Esq.
January 2, 2014
Page 14

Your continued efforts to remain my appellate counsel in light of our clear conflict of interest is also a basis of my current complaint to the Wash. Bar Assoc. against you.

Your characterization of my testimony as delusional-false undermines my credibility with the Ninth Circuit and is NOT accurate.

Your failure to recognize the prosecutorial misconduct in my case and instead rush to judgment that I'm suffering mental illness clearly is harmful to the credibility of my trial defense and to me personally. It further serves to help cover up the prosecutorial and law enforcement misconduct that took place and in effect denies me an opportunity to present the same to the Ninth Circuit for remedy.

With all due respect, I do not want you to continue as my counsel and it is in fact quite unethical for you to try to do so. Please withdraw from the case on your own motion immediately.

Sincerely,

Francis Schaeffer Cox

Supplemental Exhibit

Part 3(A)

Francis Schaeffer Cox, #16179-006
USP Marion CMU
PO Box 1000
Marion, IL   62959

Court Administrator
United States Court of Appeals
For the Ninth Circuit                      LETTER/MOTION
J. Browning Courthouse                     To Compel Service
95 7th Street                              No. 13-30000
San Francisco, CA    94103-1518

December 24th 2013

In Re:  U.S. vs. Cox, No. 13-30000

Dear Court Administrator:

    I apologize for the inconvenience of having to bring this
matter before you, but my attorney, Mrs. Elliott, and I are in
adversarial proceedings with one another.

    She has failed to serve me with a copy of the government's
"Motion For Clarification DKT. 23."  If there have been any other
pleadings filed in response by the government, she has also failed
to serve me with copies of those.

    The only filings I have received have been Mrs. Elliott's
"Motion For Remand and Competency Hearing" dated December 12th
2013, and her "Response to DKT. 23 Government's Motion For Clarifi-
cation" dated December 18th.

    Please send me copies of ALL filings I have not received and
set a reasonable date certain for me to respond to such filings.

    Additionally I respectfully ask that you issue an administrative
order that Mrs. Elliott and/or the government serve me copies of
all filings in a timely manner until arrangements for new counsel
can be made.

    Again, I apologize for the inconvenience and I deeply appre-
ciate your caring attention to the matter.  My service address is
the same as below.

Respectfully submitted,

Francis Schaeffer Cox, 16179-006
USP Marion CMU
PO Box 1000
Marion, IL   62959-7500

Supplemental Exhibit

Part 3(B)

Peter A. Camiel                                        Judge Robert J. Bryan
Law Offices of Mair & Camiel
710 Cherry Street
Seattle, WA 98104
(206) 624-1551
Fax: (206) 623-5951
petercamiel@yahoo.com


## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 3:11-CR-00022 (RJB) |
| | ) | |
| Plaintiff, | ) | SENTENCING MEMORANDUM OF |
| | ) | DEFENDANT COX |
| v. | ) | |
| | ) | |
| FRANCIS S. COX | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

### DEFENSE SENTENCING RECOMMENDATION

Defense Counsel respectfully recommends that this Court impose a sentence of 120 months total custody. Mr. Cox has now been in custody since the day of his arrest on March 10, 2011. Mr. Cox has no ability to pay a fine as he is now indigent. Mr. Cox also requests that the Court provide a recommendation that he be designated to serve his sentence at the BOP facility in Sheridan, Oregon as Mr. Cox has family in Oregon who would be able to visit him. Finally,

1

for reasons discussed below, Mr. Cox needs to be in a facility that can provide mental health treatment.

## THE U.S. PROBATION PRESENTENCE REPORT

The United States Probation Office has prepared a presentence report (PSR) and concluded that the advisory sentencing guidelines (USSG) in this case calculate to a total offense level of 49 and an imprisonment range of life and a sentence recommendation of 420 months. The defense has noted both factual and sentencing guideline objections to this report contained herein and at Exhibit A. Those objections are incorporated herein and reasserted.

## THE OFFENSES

Mr. Cox was convicted of count 1 (conspiracy to possess unregistered silencers-5 year maximum term), count 2 ( possession of unregistered destructive devices- 4 grenades-10 year maximum term), count 3 (possession of an unregistered silencer-10 year maximum term), count 4 (possession of an unregistered machine gun-10 year maximum term), count 5 (illegal possession of a machine gun-10 year maximum term), count 6 (making a silencer-10 year maximum term), count 10 (possession of an unregistered destructive device-a hornet's nest and launcher-10 year maximum term), count12 (conspiracy to murder officers and employees of the United States- life maximum term), and count 16 (solicitation of others to engage in the murder of an officer of the United States-20 year maximum term).

Mr. Cox was found not guilty of count 7 (carrying a firearm during and in relation to a crime of violence-as to count 1), and not guilty of count 15 (carrying a firearm during and in relation to a crime of violence-as to count 12).

2

## SUMMARY OF SENTENCING ARGUMENT

A sentence of 35 years as recommended by the government and by U.S. Probation is far more than is necessary to achieve the statutory and policy goals of sentencing set forth by Congress given Mr. Cox's actual conduct, and his history and characteristics.

The evidence at trial showed Schaeffer Cox to be, at times, a loud mouthed, narcissistic, often delusional young man who appeared to enjoy hearing himself speak, and enjoy the attention he was receiving in the media. Without question his statements, both public and private were sometimes obnoxious, and sometimes chilling and to some even threatening. He appeared to have a grandiose view of himself and to see himself as a patriot and a martyr. A judge and a jury hearing his words could easily find him to appear threatening. Yet for all his brash talk, he never actually inflicted physical harm upon anyone. Whether he really ever intended to do so was in dispute at trial. However, by the time of his arrest on March 10, 2011 he was trying to leave Alaska with his family and was described by the FBI as completely exhausted.

What was, unfortunately, unknown about Mr. Cox at the time of the government's investigation and at the time of trial was that he was suffering from severe mental illness that made him particularly susceptible to influences that fed his already paranoid personality and drove him further away from being able to distinguish reality from delusions.

Following Mr. Cox's convictions the Court authorized a psychological evaluation of Mr. Cox based on the concerns of counsel. That evaluation, completed by Dr. Robin Ladue, and attached as Exhibit B, concludes that Mr. Cox suffers from Paranoid Schizophrenia as well as

Delusional Personality Disorder and Paranoid Personality Disorder.[1] His delusions, which were becoming increasingly bizarre, were supported by many of the people with whom he associated. Mr. Cox's undiagnosed mental illness played a large role in the conduct for which he was convicted.

Had his mental illness been diagnosed prior to trial he may well have had a diminished capacity defense to the charges that require specific intent.[2] This court may now consider Mr. Cox mental illness in determining his sentence.

Section 5K2.13 of the now advisory United States Sentencing Guidelines contains a policy statement on diminished capacity:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.
>
> However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

The commentary to this guideline states:

1. For purposes of this policy statement—
"Significantly reduced mental capacity" means the defendant, although convicted, has a

---

[1] As a result of the timing of the psychological evaluation, the diagnostic information discussed above was not available to the United States Probation Office in the preparation of their report. However, it should be noted that in the "justification" section of the probation recommendation Mr. Cox's motive were described as "irrational" and probation recommended mental health treatment upon Mr. Cox's release.

[2] Ninth Circuit Model Criminal Jury Instruction 6.9 provides that a jury may consider evidence of a defendant's diminished capacity as time of the crime in deciding whether the government has proved beyond a reasonable doubt that the defendant acted with the intent required to commit the crime charged.

significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful.

"The goal of [§ 5K2.13] is lenity toward defendants whose ability to make reasoned decisions is impaired." *United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir. 1993); see *United States v. McBroom*, 124 F.3d 533 at 548. As such, a district court may depart downward to "reflect the extent to which the reduced mental capacity contributed to the commission of the offense." U.S.S.G. § 5K2.13. The Ninth Circuit has held explicitly that "[§ 5K2.13] requires only that the district court find some degree, not a particular degree, of causation" between the defendant's mental condition and the commission of the offense in question. *Cantu*, 12 F.3d at 1515.

As will be discussed in further detail below, Mr. Cox was indeed suffering from a severe mental illness which resulted in a significantly reduced mental capacity and this reduced mental capacity contributed substantially to the commission of the offenses.

## Mr. Cox Mental Illness

While awaiting sentencing Mr. Cox underwent a psychological evaluation conducted by Dr. Robin Ladue. Dr. Ladue has been a licensed clinical psychologist since 1984 and holds licenses in Washington and Oregon. In addition to her clinical practice she has conducted numerous forensic evaluations and has appeared as an expert witness in Washington State and Federal Courts. Dr. Ladue's report of her evaluation of Mr. Cox and her CV are attached as Exhibits B & C.

Dr. Ladue's diagnosis of Mr. Cox includes Axis I: Paranoid Schizophrenia; Axis II: Delusional Personality Disorder/Paranoid Personality Disorder. These diagnoses are based on

5

objective well recognized tests including the MMPI-2, the FIRO-B, behavioral observations, and a review of a large volume of case related materials. To defense counsel's knowledge, prior to this evaluation Mr. Cox had never previously undergone a mental health evaluation of any type.

Dr. Ladue writes in part:

The purpose of this evaluation was to assess whether Mr. Cox was suffering from any type of mental illness that caused him to behave as he did. His level of paranoia seems to have led to him engaging in increasingly bizarre and disorganized behavior to include abandoning his home and business and go into hiding with a plan to leave the state with a fictitious truck driver. According to Ms. Marti Cox and other reports, Mr. Cox was becoming increasingly obsessed with the militia and in his beliefs that the government was about to collapse and that there would be chaos. He also appears to her to truly believe that there was a federal plan to kill him and take his son. His obsession created a rift in their marriage and immersed him in an increasingly bizarre plan, which, eventually led to his arrest and subsequent conviction on the charges outlined at the start of this evaluation.

Mr. Cox's actions began to deteriorate in his late teen's and early twenty's. This is consistent with the time that mental breaks usually occur for people diagnosed with schizophrenia and when full blown personality disorders become apparent. This was definitely the situation with Mr. Cox. It is unfortunate that, until this evaluation, no one has taken the time and effort to assess Mr. Cox's serious mental health problems. The longer he was involved with the Liberty Bell Network, The Second Amendment Coalition and the Alaska Peacemakers Militia, over the course of approximately three to four years, the more he received external support for his paranoid delusions and, due to it being untreated, the worse his mental illness became.

(Dr. Ladue report p.17-18)

Dr. Ladue describes her diagnosis in detail:

To better understand the diagnostic criteria and seriousness of Mr. Cox's mental illnesses, the following is presented:

The World Health Organization defines Paranoid personality disorder as a mental disorder characterized by paranoia and a pervasive, long-standing suspiciousness and generalized mistrust of others. Individuals with this personality disorder may be hypersensitive, easily feel slighted, and habitually relate to the world by vigilant scanning of the environment for clues or suggestions that may validate their fears or biases. Paranoid individuals are eager observers. They think they are in danger and look for signs

6

and threats of that danger, potentially not appreciating other evidence.

They tend to be guarded and suspicious and have quite constricted emotional lives. Their reduced capacity for meaningful emotional involvement and the general pattern of isolated withdrawal often lend a quality of schizoid isolation to their life experience. People with this particular disorder may or may not have a tendency to bear grudges, suspiciousness, tendency to interpret others' actions as hostile, persistent tendency to self-reference, or a tenacious sense of personal right.

The DSM-IV defines a Paranoid Personality Disorder as noted below:

Individuals with this Cluster A Personality Disorder distrust others and are suspicious of their motives.

Diagnostic criteria for 301.0 Paranoid Personality Disorder

> A. A pervasive distrust and suspiciousness of others such that their motives are interpreted as malevolent, beginning by early adulthood and present in a variety of contexts, as indicated by four (or more) of the following:

>> (1) suspects, without sufficient basis, that others are exploiting, harming, or deceiving him or her  (2) is preoccupied with unjustified doubts about the loyalty or trustworthiness of friends or associates  (3) is reluctant to confide in others because of unwarranted fear that the information will be used maliciously against him or her  (4) reads hidden demeaning or threatening meanings into benign remarks or events  (5) persistently bears grudges, i.e., is unforgiving of insults, injuries, or slights  (6) perceives attacks on his or her character or reputation that are not apparent to others and is quick to react angrily or to counterattack  (7) has recurrent suspicions, without justification, regarding fidelity of spouse or sexual partner

> B. Does not occur exclusively during the course of Schizophrenia, a Mood Disorder With Psychotic Features, or another Psychotic Disorder and is not due to the direct physiological effects of a general medical condition.

The diagnostic criteria for schizophrenia:

> A. Characteristics symptoms: Two or more of the following, each present for a significant amount of time during a one month period:

>> o  Delusions

>> o  Hallucinations

>> o  Disorganized speech

>> o  Grossly disrupted or catatonic behavior

7

     o   Negative symptoms, i.e. affective flattening

B.  Social/Occupation Dysfunction:

For a significant period of the time since the onset of disturbance, in one or more areas of functioning such as work, interpersonal relationships, and self-care markedly below the level achieved prior to the onset of the problems.

C.  Duration:

Continuous signs of the disturbance last for at least six month.

D.  Schizoaffective Disturbance is ruled out

E.  Substance abuse/medical conditions are ruled out.

It is clear from a review of these symptoms that Mr. Cox was likely suffering from all of them. In his case, it is difficult to ascertain whether he has schizophrenia and/or a paranoid and delusional disorder due to the ongoing involvement of others that supported his delusions and increasingly bizarre behavior. Whichever the case might be, it is abundantly clear that Mr. Cox' ability to function was deteriorating and the people "closest" to him were deeply involved in similar beliefs and encouraged his delusions and increasingly out of control behavior. While this evaluator certainly does not agree with or support the alleged behaviors presented in the United States Government case as outlined at the start of this evaluation, it is equally clear that, as opposed to the self-sufficient, articulate, charismatic leader the Plaintiffs presented, Mr. Cox was severely mentally ill and getting worse. It is questionable as to whether his behavior would have escalated to the extent it did had there been appropriate intervention and medication management provided to Mr. Cox.

(Dr. Ladue's report pp.18-20)

One only needs to look at Mr. Cox's behavior to see his increasingly paranoid and delusional thought process. In a well reported speech in November 2009 he told an audience he had a 3500 member militia. He told his audience:

*It is not a rag-tag deal. I mean, we're set: we've got a medical unit that's got surgeons and doctors and medical trucks and mobile surgery units and stuff like that. We've got engineers that make GPS jammers, cell phone jammers, bombs, and all sorts of nifty stuff. We've got guys with, we've got airplanes with laser acquisition stuff and we've got rocket launchers and grenade launchers and claymores and machine guns and calvary and we've got boats. It's all set.*

8

There were no more than a few militia members and there were no surgeons nor any medical trucks, GPS jammers, bombs, airplanes lasers or boats. It was all fantasy.

In December 2009 Mr. Cox was confronting uniform customs officers and in January 2010 TSA officers. He was at Ft. Wainwright seeking asylum and protection from a federal hit team of "soulless" assassins that did not exist. He thought he needed a team of security guards around him when he went to court or to do a radio interview. He took to hiding out in the homes of friends. He was telling his wife and parents of the plot to kill him. And finally by February of 2011 he had abandoned his home and business with a plan to sneak out of Alaska hidden away in a tractor-trailer. Throughout this entire time, Schaeffer Cox continued to associate with those whose own apocalyptic view of the government bolstered his paranoid delusional view of the world around him. As his former lawyer Robert John writes regarding his inability to represent Mr. Cox in his Liberty Bell case:

> I was unable to continue representing Schaeffer in the Liberty Bell case, however, as he came under the influence of older individuals who were members of various associations often grouped under the umbrella of the "Sovereign Citizen" movement. Perhaps some of these folks had axes to grind. Perhaps not.

Dr. Ladue also noted the influence that older individuals who espoused radical views had over Mr. Cox. Finally, the influence of the government informants played a key role. " The more the government informant instigated Mr. Cox. The more paranoid and delusional he became." (Dr. Ladue report p.20)

## OVERVIEW OF THE CHARGED COUNTS

While Mr. Cox was convicted of the aforementioned counts, there were no acts of actual violence committed or attempted in this case that were either proven or alleged. Moreover, the counts of conviction included conspiracy to possess devices provided by the government itself

9

including silencers and grenades. There was no evidence showing that, had the government not attempted to provide these materials, that Mr. Cox had any other source of such items.[3]

As to count 10-possession of a "Hornet's Nest" canister and 37 mm launcher- counsel is not aware of any other case in the United States where possession of such a device has been deemed to be unlawful possession of a destructive device. Indeed both items were readily available for legal purchase without any registration requirement. While these items, when possessed in combination were held to technically constitute destructive devices, they are a far cry from pipe bombs, missiles, or truly dangerous explosive devices.

The charges of conspiracy to murder government officials and solicitation of the murder of government officials were not included in the original indictment, nor in the first or second superceding indictments, but were added in the third indictment, apparently after a plea offer from the government was rejected. These new charges were based on the government theory that either the KJNP security detail, the "hit list" and/or the 2-4-1 plan amounted to a plot to, without justification, kill government officials.

### The KJNP Security Detail

The November 23, 2010, KJNP Cox radio station interview and security efforts, were clearly rejected by the jury as part of any murder plot. The government has argued that this event constituted evidence of the conspiracy to murder government employees. However, the evidence supporting this claim was highly suspect. First, Mr. Cox and his companions had sought permission of the property owners to set up security for Mr. Cox. This was born out from the testimony of Richard Olson the vice president of sales as KJNP. In addition, the claim that

---

[3] While there was a claim by J.R. Olson that Mr. Cox possessed 8 grenades, this was completely uncorroborated and indeed no such items were ever found nor did any other witness claim to have seen such items.

this was an effort to engage in an illegal shootout with law enforcement is simply untrue. For example, the "white board" discovered at Coleman Barney's residence describing the "security plan" specifically stated at item #6 "Do not shoot unless life is in danger". Item 11 provided: "Trooper comes to arrest-allow peaceful arrest." Indeed, it appears that the jury rejected this incident as being a part of any conspiracy to murder government employees because the jury did not convict Coleman Barney-who was in charge of the security for this event-of count 12. In addition, the jury acquitted Mr. Cox of count 15 charging carrying a firearm during and in relation to a crime of violence. Finally, the jury acquitted Coleman Barney of conspiracy to commit murder and it was Mr. Barney who was in charge of the security at KJNP. If the jury believed that this effort was anything other than security and self-defense Mr. Barney would have been convicted of the conspiracy to commit murder charge.[4]

The KJNP detail does, however, demonstrate Mr. Cox's paranoid view of the world around him. He believed so strongly that there was a plot to kill him that he felt the need to have armed security guards set up a perimeter around the radio station to protect him.

THE 2-4-1 PLAN

Much was made by the prosecution of the so called "2-4-1 plan as evidence of Count 12, Conspiracy to murder officers and employees of the United States and Count 16, Solicitation of Others to Engage in the murder of an Officer or Employee of the United States.

While Mr. Cox and the other defendants did discuss the possibility of such a plan, the "2-4-1 plan" was "pushed" aggressively and repeatedly by government informant J.R. Olson. A

_____

[4] One of the jurors wrote a letter to the Court wherein stating in part that "I don't think the prosecutor understands that the ONLY criminal charge stemming from the KJNP "security detail" that resulted in a conviction was Coleman's possession of an illegal destructive device. The jury categorically rejected the prosecution's allegation that this was a murderous plot to kill federal officials, but was instead a plan to lawfully defend themselves if attacked by non-uniformed agents who began shooting without identifying themselves."

11

good example is on February 19, 2011 when Olson tried to get Cox and others to come up with a

plan of implementation. (Govt. Ex. 24) Olson repeatedly made comments including:

> I think we need to have that stuff planned out.

> What's to kick into place if such and such happens, you know. Because if they get you and throw you in a cage, you're -- you're not going to be able to communicate nothing to us.

> I want to go over, too, what -- what our response will be

> What happens when -- when they start grabbing us one-by-one? You know, if they were to swoop in. Say -- say -- say they were to swoop in, take Lonnie, take you guys, charge you with -- with all kinds of federal crimes, you know, you're looking at crimes of 20 years.

> At what point, you know, at what point do -- do we -- do we determine that those scales are -- aren't being tipped? You know, if they start -- if they're -- if they're dissecting us one at a time or two at a time, and –

> I mean we should plan as if it's going to happen—(2.12.11 p. 68) (this was not included in the government Ex 14)

> You know, it'll just be a matter of time before they -- they -- they come in. Then -- then what -- what initiates the -- the 241?

Once the 2-4-1 plan was brought up Olson suggested a 5-4-1.

> MR. THESING: Yeah, 141.
> MR. COX: 141.
> MR. THESING: But it means one four one. So whatever -- if one of us -- it"s only a one to one ratio though?
> MR. COX: (inaudible) 241.
> MR. OLSON: Or -- or a 541 (inaudible) ( Govt. Ex. 14-2.12.11 p.72)

Schaeffer Cox repeatedly put off or slowed down Olson's enthusiasm for

such a plan with comments such as:

12

MR. COX: But I'm not motivated by wanting to see their heads roll. I'm motivated by wanting my family to live a free and prosperous and happy --

MR. OLSON: Yeah.

MR. COX: -- (inaudible) life. And, so, we need to keep that in -- in mind. And then that brings us to the other thing, is the difference between a war and a fight. All right, we're all willing to -- for a war, okay, but that's different than looking for a fight. And with what you were talking about for the 241 and stuff like that, meaning just a gesture, that's looking for a fight. Now, if you're just all is lost and all you can do is make it a, you know, bargain for them so then maybe they'll slow down on the next guy, there's nothing wrong with that.

MR. COX: As -- as a final thing, but we need to think about the war and not just about the fight. And, so, I believe that at this point with the Socioeconomic dynamics that we've got right now, something along the lines of 241 or any sort of very aggressive, offensive maneuver is probably -- I mean, you can't say what's (inaudible) it seems like to me, given the circumstances, that that would be more along the lines of looking for a fight rather than strategically and prudently waging a war.

MR. COX: All right, so, 241, in my estimation, was only valid when the option of a -- of somehow allowing that scale to continue slowly tipping in our favor is totally out of the question and not doable. When that –

MR. COX: When -- I mean, when that -- by allowing the scale to keep tipping, it's out of reach and our only choice is to either go down quiet or go down costing them, that's when 241 comes in.

MR. COX: I lost my house, my business, my whole fortune because that's okay, you know. And I could, if I was looking for a fight and I was feeling vengeful, which what's wrong with feeling vengeful, man? We've been wronged. I could go out and I could sock it to them, and that would satisfy my animalistic reaction to their -- their (inaudible) righteous wrath, though it may be, *wrong doing.*

MR. OLSON: Mm-hmm.

MR. COX: But it would -- it would be a detriment to the war, and, so, because I believe you, that me losing everything and just walking away from it, get me your -- back to your friend's container and get smuggled through Canada with nothing but a gym bag and a rifle, and we lose everything and let the scales keep tipping, that's what I -- that's what I think has the brightest future for my -- for my family.

MR. COX: Because only when there is no future and there is no hope for my wife and for my children can I then spend myself. Only in costing --

MR. COX: *Because costing the enemy is not my objective.*

MR. COX: I would forgive them and have all sorts of redemption and go to a picnic with them *if they'd leave me alone.*

13

MR. COX: You know, I don't have hatred towards them.

MR. COX: But it's only going to satisfy my angry bloodlust, then that is -- that is -- that is keeping (inaudible)*on my family and on your families. And that's not -- that's not who we can be. We're the family militia. [5]

MR. COX: -- that at least right now, and I can't speak to the future. But I can say that I think for right now, a 241 is -- is -- would -- would be running out ahead of the scale and sacrificing our self *to no avail.*

AUSA Skrocki warned the FBI that CI-1, Olson, was "pushing Cox a bit too hard" toward adopting the 2-4-1 plan. Mr. Skrocki was clearly concerned that Olson was instigating and not just listening. Mr. Skrocki's warning carries even more import now that it is known that the man that Olson was "pushing" was suffering from paranoid schizophrenia and paranoid and delusional personality disorders. Olson's pushing and encouragement played into Mr. Cox's already paranoid personality.

In an email by AUSA Skrocki to the U.S. Attorney Mr. Skrocki described

His review of the recording of the February 12 recorded meeting.

From: Skrocki, Steven (USAAK)
Sent: Sunday, February 13, 2011 4: 13 PM
To: Loeffler, Karen (USAAK)
Subject: Cox-(long email--sorry)
Listened to conversation from last night. In summary, they are kicking around ideas. My advice, do not arrest him he doesn't show, but issue the warrant and let it sit. With the source in place, we'll have the best idea of what's going on, and it won't agitate Cox's followers---you might want to give Mike Grey and the S A C a call tonight too. The SAC can verify with Rick what I'm saying--
"241" stands for, if they take one of us, we take two of them. But they discuss not being strong enough to impose their views on the rule of law. They discuss everything from 2 4 1, to fleeing, to the rapture coming and waiting for that. In my view, *the FBI source is pushing Cox a bit too hard* on not getting arrested, and the source agrees too much in moving their plans forward which would generate a response, whether violent or not. The

---

[5] Mr. Cox recalls what he actually said was "that heeping more burden on my family..." rather than "keeping (inaudible).

source adds, "why don't we make it 5 4 1" (not a good idea, FBI has to fix this) After some discussion of "2-4-1", Cox says, "we're just speculating here and I want to hear where you stand". Cox does say he would be morally correct in shooting a judge, but adds that he doesn't want to do that. So he makes the big pronouncement, then backs off. The typical, "{ *will ...... but not just yet"* type stuff.
(emphasis added)

At trial the government argued to the jury that in fact 2-4-1 was a part of the conspiracy and solicitation of murder when the government's own lawyers understood that was not necessarily the case because Mr. Cox and his companions were just "kicking around ideas" and "speculating" rather than actually plotting violent acts..

What is clear is that while Olson wanted to try to get Mr. Cox and the others to come up with a specific plan of action, Mr. Cox wanted to discuss leaving the state with his family, which is exactly what he was trying to do when he was arrested. Schaeffer Cox was saying he wanted to be left alone, that he does not have hatred toward them, and that the 2-4-1 would be to "no avail."

On February 12, 2012 there was a "command staff" meeting to discuss the 2-4-1 plan. Government informant Olson kept trying to have the "plan" which was merely a vague concept become an operational plan for Monday, the day Mr. Cox was going to miss court and a warrant was expected to issue.

Cox responded that such a plan was "scariest" thing for him to talk about.

MR. COX: Okay. So 241 would be that mode and then hopefully the price is so high that they leave (inaudible) on the shelf? And this is horrifying. Like -- this is like the most scariest thing for me to talk about. (Govt. Ex. 14-2.12.11 p. 72)

Olson continued to try to get the group to adopt a real, rather than hypothetical plan.

15

MR. OLSON: Well, moral -- morally I see it. I -- I have no problem with it. You know, if -- if -- if they -- if they want to play this kind of war, then I have no problem playing -- playing their game with them so to speak; playing their war with them. What -- so -- so -- so now that -- now do -- do -- do we have -- who do we -- who would we go for? Say -- say they, just hypothetically, they -- they come and get you, they come and arrest you. They pick you up on your way to Fred Meyer and at the -- and -- and you know, there's – there's no (inaudible) were to stop them from getting you. They -- they -- they grab you; who do we go after then? Do we just go randomly grab two troopers? Go randomly grab a judge, you know, how do we -- how do we determine who we go for on -- on the two for one?
MR. COX: *Now keep in mind we are all just speculating now.*

(Govt. Ex. 14-2.12.11pp 86-87)(emphasis added).

Mr. Cox tried to put the 2-4-1 idea on the back burner.

MR. COX: So, I don't know what all the particulars are but -- and I don't think we're there yet. But I mean, once you start down that road (inaudible). All right, yeah, I'm just wanting to hear guys – that's a tough issue -- subject.
(2.12.11 p. 89)

Mr. Cox also emphasized that the plan would never actually work.

MR. COX: Even if we followed the two for one scenario out what I see -- and this is from what I've seen with even our guys and stuff like that -- everybody that, you know, the idea of Patriotism and the idea of what we're doing -- they love the idea but what -- what I see will happen if they grab you and we go for a two for one it's going to be --
MR. OLSON: Us three. Well, we have Vernon.
MR. COX: And you guys won't want to be involved with it until they fail to see enough sufficient force even on them to justify, you know, they'll just stand and it will be the three of us.
MR. OLSON: Well, we'd have Vernon, we'd have four. Lonnie. Because I think Lonnie'd be right with --
MR. COX: Yeah, there'd be four of us and it will be real quick and it will be over and they will -- and all this -- and all it's been doing will just go away. And I think it will be -- all the pioneering and all of the (inaudible) I think it will just be gone away and they'll say, we'll I guess that was that. And you know, he was a wacko just like, you know, the media painted him out to be. And I think that'll be the end of it. I don't think that -- our war will just be over like that. (Govt. Ex. 14-2.12.11 pp 100-101).

On February 12, 2011 after a long discussion about the 2-4-1 "plan" Cox said:

MR. COX: So we're all on the same page, um, uh – the plan, as far as 241 is to bluff it, pray, and work towards it not being a bluff, and then at the moment my plan is to hide, to

16

avoid, if I get busted -- if I get captured, *I'm not going to do a Rambo, I'm going to do a Gandhi.* So, I'm not going to carry an ID, I'm not going to anything, (emphasis added)

The recording of the February 19 meeting reveals that Mr. Cox ultimately rejected the 2-4-1 plan.[6] This particular segment was not included in government exhibit 24 of the February 19 meeting but does appear in the transcripts at 140

MR. BARNEY: Yeah, we're all in this together. But I know right now, the atmosphere, I don't feel it's right to -- if we -- if we take up arms, it's going to be -- I -- I wonder if anything would really even come out of it other than we'll be dead and our wives and children will be left to themselves. I don't think that any -- that people around us won't see us as martyrs.
MS. VERNON: Mm-mm.
SPEAKER #: No.
MR. COX: *It'll be a fruitless gesture.*
(emphasis added)

The so called "2-4-1 plan went no further than this. It was all talk and ultimately no decision was ever made to implement the idea.

In addition to government informants Fulton and Olson trying to push Cox to agree to violent acts, another government informant, Aaron Bennett tried to get Cox to agree to engage in violent acts and he refused. During the February 12, 2011 meeting that Olson recorded, in another portion that was not included in Government Ex. 14, at p. 152-153(the Government Ex. 14 jumped from p. 120-155) Mr. Cox stated:

But then I'm not – he's [Aaron Bennett]constantly pushing me, you've got to just fight and start the killing, you know, and figure it out later, you know, and I'm being very temperate and, no, hold back, let's not be premature, you know, that's just retaliation, that's just vindictive, you know, oh, Nelly, whoa, Nelly, pump your brakes, you know?
MR. OLSON: Put the reins on.
MR. COX: And he gets sick of me saying pump your brakes too much and now I think where he's at is he's trying to destroy me because I'm a cork in a bottleneck. (Feb. 12 2011 pp 152-153)

---

[6] The February 19, 2011 recording runs 430 pages. This segment did not appear in government exhibit 24 but does appear on page 140.

17

To be clear, the jury convicted Mr. Cox of counts 12 and 16. However, the actual statements by Mr. Cox were not as clear-cut as the government presented at trial and there were other statements that were not introduced as a result of government hearsay objections that seem to soften many of Mr. Cox's statements.

The 2-4-1 plan is further demonstration of Mr. Cox paranoid delusions. He believed that the government would soon be coming after and killing him and those who shared his beliefs and that he would need a plan to respond to this government action.

<u>THE ALLEGED " HIT LIST"</u>

Much was made of the so call "hit list" although there was never an actual list. Michael Anderson testified that he started a database which he later destroyed where he researched the home addresses of some individuals some of whose names he received from Mr. Cox. According to Anderson, Mr. Cox wanted the information in case martial law was imposed in order to know who to go after. At some point Mr. Anderson found Mr. Cox's paranoia about the government so bizarre that he destroyed his database and discontinued any further efforts on Mr. Cox's behalf.

A page in a notebook of Anderson's headed by the phrase "federal hit list" (Ex. 506) was written by Anderson on his own after Mr. Cox had told him about a plot by federal agents to kill him. Mr. Cox wanted Anderson to try to find out the identity of the federal agents sent to kill him. Anderson had read a news article about a particular U.S. Marshal and put the marshal's name below the "federal hit list" phrase. No other names were written down. Anderson said after he wrote this, he never went back to it. (Anderson testimony p. 73). Mr. Cox had never asked him about this U.S. Marshal.

18

Even the FBI had doubts about the purpose of the list. In an e-mail dated March 3, 2011-a mere 7 days before the arrest of Mr. Cox SA Sutherland wrote:

> Any idea of Cox's intention with the "list", *especially in light of the fact that he is leaving?* Is this the target list of LE and judges? Yes, the list of LEO's and targets. No known intentions other than more potential deterrents. (emphasis added)

At trial of course, the government argued Mr. Cox's intentions were to kill those on the list. The jury never heard that the government's own lead investigators questioned Mr. Cox's intentions since he was clearly planning to leave Alaska.

### Schaeffer Cox Fear of the Government

Mr. Cox testified that he truly feared the government was out to kill him. If Mr. Cox were not suffering from mental illness, this claimed fear may appear to have been fabricated. However, when viewed in the context of someone suffering from paranoid schizophrenia, this claimed fear makes Mr. Cox's conduct more understandable. This belief that the government was out to kill him, while irrational was not without some foundation. Testimony was presented from Steven Gibson a military police officer that he was approached by both the F.B.I and a U.S. Marshal for copies of surveillance video of a visit to Ft. Wainwright by Mr. Cox, his wife and son in the summer of 2010. Gilson was told by these agents that Mr. Cox had a dispute with OCS over his son and that the agents expected Mr. Cox to use force to prevent OCS from taking his son. Moreover, the agents told Gibson that if Cox did use force to prevent OCS from taking his son that "he most likely would be shot and killed." (15-196). Based on this information, Gibson sought out Mr. Cox whom he had never met before, and warned him about these

19

comments. When Mr. Cox heard of these comments by federal authorities his belief that there was a government conspiracy to engage him in a shootout and kill him was exacerbated.

Mr. Cox also expressed his fear of being killed to people who did not testify at the trial including his father Gary Cox ("He thought his life was threatened by these informants. One day he and Marti came to our home and sat down to tell me he thought they would kill him and make it look like a murder/suicide."), his friend Richard Neff ("On more than one occasion, before he was counted as a fugitive, Schaeffer, Marti and Seth took refuge in our home because Schaeffer feared the government was going to launch some intrusion to harm his family.") Myra Ness told the probation officer that Mr. Cox repeatedly said that the government was "out to get him."

Mr. Cox claimed his actions were motivated by his own fear that government agents were out to engage him and kill him. As ludicrous as this may appear to most people, Mr. Cox fear was fueled by specific events such as the report he received from Steve Gibson. Mr. Cox was already suffering from the paranoid schizophrenia and paranoid and delusional personality disorders. In this state of mind, events such as Gibson's report to Mr. Cox served to only exacerbate and confirm his paranoid beliefs.

Schaeffer Cox's Fear of Bill Fulton

Schaeffer Cox testified that he was in fear of Bill Fulton because of Fulton's threats and that many of his actions were made in response to this fear. The government dismissed this claim as a fabrication. Mr. Cox believed that Fulton expected Cox to carry through with engaging in a plan of violent action against government officials and that if he did not, Mr. Fulton would come after Mr. Cox. Mr. Cox fear of Fulton was not without objective basis. The fact that Fulton, acting as a government informant would engage in not just verbal threats to kill, but in the display of a knife and the making gestures to kill under the pretext that he was enraged

that Mr. Cox and his fellow militia members did not have a "plan" to carry out violent acts against judges is as close to outrageous government conduct as imaginable. It is one thing to have an informant sit back and listen to gather information and another to have an informant use coercive tactics and threatening gestures to try to entice lawlessness.

This court heard the graphic testimony of Michael Anderson regarding Fulton's behavior when Fulton was told that Mr. Cox had no plan to engage the authorities in violent acts during the pendency of the state child custody case. In fact, after the Blondie's encounter, Mr. Cox never again met with Mr. Fulton in person.

Anderson described Fulton:

"I found him to be extremely gruff, a fat drunkard, rude, extremely violent."

Mr. Cox only "plan" was to file more "paperwork" with the Court but Fulton wanted violence. Anderson's testimony continued:

And so Schaeffer talks a little bit about filing some more paperwork in the court system and it's not quite what Bill Fulton wanted to hear.

Q: So is there -- Mr. Fulton says to Mr. Cox about what?

A: He wants to know what the plan is that they talked about.
And so Schaeffer went into this generalized idea of, well, we're going to arrest some judges and we'll arrest judges and put them on trial before the Thursday hearing. And Bill Fulton wanted to hear what the actual plan was. 'How are you going to do this?'

Q: In other words, arrest the judges?

A: Yeah. And so that was -- 'Well, we could bury some connexes on Monday and then we could arrest them on Tuesday and put them on trial Wednesday.' It was kind of a general thing. Bill Fulton wants to know, 'What's the plan? How are we going to do this?' And then all of a sudden Les Zerbe pipes up and he says, 'There's no plan. We don't have a plan to do this.'
And Bill Fulton, at that point -- and my memory's a little vague and I -- I don't remember if he actually pulled out a knife or -- or not. I would say my memory's like 50 percent on that. I want to say he did, but I can't say it firmly. What I

21

distinctly remember is him kind of lunging toward Les Zerbe and saying, 'No plan? What do you mean, you have no plan? You're supposed to have a plan, you fucking piece of shit. *I'm going to slit your throat. I'm going to kill you, Les.' And he kept going on and on and on.* And Les Zerbe and Schaeffer were very calm and finally things calmed down a little bit after several minutes of this nonsense. And, you know, Schaeffer says, you know, 'We just don't have a plan. We don't have logistics for this. We can't do it.' 'What do you mean we don't have logistics, Schaeffer? I spent $30,000 bringing men and equipment up here. You want me to send them all back?' And Bill Fulton, you know, Bill Fulton was continuing with this. Schaeffer finally just says, you know, 'Bill, look, I've -- I've never been in a fight in my life. I've never even punched someone in the nose and I don't want to start now.' And then Fulton says, 'What do you want me to do, Schaeffer? You want me to call it off?' And Schaeffer says, 'Yeah, call it off.' And so from that point on, it cooled down. It looked like Schaeffer had convinced Fulton to call it off.

Q: Call what off?

A: This thing of arresting judges.

(Trial testimony of Michael Anderson, May 15/12 Day 6, pp. 36-37)

As Fulton told Vernon on February 2, 2011:

MR. FULTON: The only reason I didn't break it off with Schaeffer's group was because of Schaeffer after that thing with Les.

MR. OLSON: Yeah.
MR. VERNON: Yeah.
MR. OLSON: So, it must have been pretty bad -- pretty tense with Les, huh?
MR. FULTON: Oh, I was seriously going to kill him.
MR. OLSON: Is that right?
MR. FULTON: I was going to fucking end his existence on this planet. Yeah, I was not fucking around at all. What happened was -- that was last summer when Schaeffer didn't know which way it was going to go with the cops, whether or not they were going to come try to take his kid. And essentially he said Schaeffer (inaudible) hotel and they were sitting there and they were talking and they said look, this is what's going to happen. And when Les said this is what's going to happen after they'd left I started making (inaudible). I had fucking trucks coming to pick up our appliances and fucking (inaudible), because they said it's go, it's going to happen. So, we had a meeting over at Aaron's shop the next day. We're all standing around and there's people coming in, you know. I mean, I was in, like, 5, 6 grand at the time, and I'm, like, okay if it's going to happen, you know, let's do it.
MR. OLSON: We're ready, yeah.
MR. FULTON: Yeah. And, uh, so we're standing there and Schaeffer's supposed to be there but he had something else to do, so he's like an hour late, so I was drinking some

beers, not that I normally drink during the day -- I'm just saying. And the meeting finally starts, and we're talking and we're talking and he -- look, Les, what is the plan here? We have people in motion. We have things -- events --
MR. OLSON: Happening.
MR. FULTON: -- unfolding. This is your guys' show. What's your plan? And he's, like, well, we don't have a plan. I just fucking lost it. *I literally grabbed a knife, started coming over the counter, and I was, like, I'll fucking slit your throat open (inaudible) you fucking piece of shit.* What do you mean you don't have a fucking plan? I was, like, that's all you guys do is fucking plan. What the fuck is your plan? Well, we thought you guys would have one. (emphasis added) 2.4.11 pp 43-45).

During a meeting in Anchorage o February 5, 2011 Fulton told Olson and Vernon to remind Mr. Cox about what Fulton did to Les Zerbe in order to keep Mr. Cox in fear of Fulton.

Fulton: Okay, so when you guys get back, what you need to do is have a talk with Schaeffer. And remind Schaeffer about what happened last time when I almost killed Les.
Olson: Yeah, he remembers that.
Fulton: Well, I'm sure he does, but I want you to re-remember him.
(2/5/12 transcript p. 130)(this portion of this meeting was not played for the jury)

When Olson and Vernon returned to Fairbanks and met with Mr. Cox on February 6th they did "remind" him as Fulton has directed of the threat by Fulton to kill and suggested that Fulton meant that he would kill Mr. Cox if he did not follow through with plans of violence.[7] F

Evidence of Cox fear of Fulton is also contained in an FBI e-mail where the agents note that Cox refused to meet with Fulton and even told Olson (CS-1) that he did not want Fulton to even know he was still in Fairbanks.

Sutherland, Richard A. Jr.
Klein. Sandra L.; Locascio. Lisa A.
Plan
Friday, March 04, 2011 5:33:00 PM
SC is not willing to meet with CHS-2. Does not want him to know he is still in Fairbanks. Wants CHS-1 to broker deal. SC willing to meet "trucker" to discuss transport.
Rick Sutherland

After the Blondie's meeting where Fulton threatened to kill Les Zerbe, the FBI agents

---

[7] According to the government, the February 6th meeting was not recorded due to an equipment malfunction.

acknowledged that Mr. Cox was no more than a big talker with no plan at all.

> From: Espelandr Derek D.
> Sent: MondaYr June *14r* 2010 8:10 PM
> To: Locascior Lisa A.; Kleinr Sandra L.; Milner Bruce W.; Johnsonr Sam L.
> Subject: *Re:* SC-Fairbanks
> *Sc* was exposed as a self agrandizing fraud. He did not have a "plan" at all. Even if he had a *plan* there were allegedly other plans to off SC 48 hrs after the revolution began. SC has gone from a cadre of 24 down to 2 (Him and his *#2r* Les Derby).

This e-mail between FBI agents demonstrates that Mr. Cox fear that other militia members would kill him was shared by the FBI. ("Plans to "off SC").

It is worth noting that every single witness who testified about encountering Bill Fulton expressed fear of him including Les Zerbe and Maria Rensel. In addition, Mr. Cox never met with Bill Fulton again after the Blondie's meeting.

Fulton's conduct simply added more fuel to Mr. Cox's paranoia. In Mr. Cox's mind, everyone from government assassins to fellow militia members were going to kill him.

## THE CONDITIONAL NATURE OF THE CONSPIRACY AND SOLICITATION TO MURDER FEDERAL OFFICIALS

The government's theory about the conspiracy and solicitation to murder federal officials was difficult to pin down as the government never made clear what the agreement was between the defendant's as to who was to be killed, or when or how. What is clear from a review of the evidence is that, even without considering Mr. Cox's mental illness, the conditional nature of the alleged conspiracy was quite attenuated and remote.

In this case, the conditions which the defendants apparently agreed upon must occur in order to consider a response of the killing of federal officials included the entire collapse of the government, the imposition of martial law, and the seizing of the defendants and their families from their homes and even then, the "conspiracy" would be triggered only "when we're going to

24

be strong enough"     (Govt Closing argument 22-4)  As the Government acknowledged "we're

not telling you that it was going to happen today, that it was going to happen tomorrow, that it

was going to happen next week".

In *United States v.  Gallego*, 191 F. 3d 156, (2d Cir. 1999), the Court held that the trial

court properly instructed the jury that it could find the defendants guilty of conspiracy to murder

if "the alleged conspirators agreed that [the intended victim] would be killed if that proved to be

necessary, and if, [the alleged conspirators] believed that there was a reasonable likelihood that

the necessity of killing [the intended victim] would come about…"  Herein, the court's

instructions to the jury on the charges of conspiracy to murder government officials (count 12)

and solicitation of the murder of government officials (count 16) are contained in instructions

nos. 46,47,48 and 52.  Unlike in *United States v.  Gallego*, supra, there was no element requiring

that the jury to find that the conspirators believed there was a reasonable likelihood that the

condition precedent to the conspiracy would come about. Moreover, there was no agreement as

to the time, place, manner, means of any murder of government officials but merely discussion

that should the government collapse and /or government officials kill some of them, then they

would act.  In *United States v. Anello*, 765 F.2d 253,262 (1st Cir. 1985) then Judge Breyer (now

Justice Breyer) held that an agreement to by marijuana is "for conspiracy purposes an agreement

to buy, at least as long as the potential buyer believes the condition likely to be fulfilled."   In

*United States v. Dworken*, 855 F.2d 12, 19 (1st Cir. 1988) the court held that the test for

conditional conspiracy liability should focus on the likelihood that the condition precedent will

be fulfilled.  The court said that liability should attach if the defendant reasonably believed that

the conditions would obtain. *Dworken*, 855 F. 2d at 19.

25

While the government chose various portions of recordings to play for the jury in the effort to demonstrate that Mr. Cox had "murderous" intentions, there were many times when Mr. Cox made statements demonstrating that he wanted to avoid violence at all costs.

On February 19th the government introduced a few pages of the 430 page recording. The jury did not hear Mr. Cox state:

I don't want to hurt anybody. (2/19/11 p. 180)

I would go out of my way to not hurt women and children. (2/19/11 p.392)`

Mr. Cox also made it clear he planned to leave Alaska to avoid a confrontation with the government.

MR. COX: I lost my house, my business, my whole fortune because that's okay, you know. And I could, if I was looking for a fight and I was feeling vengeful, which what's wrong with feeling vengeful, man? We've been wronged. I could go out and I could sock it to them, and that would satisfy my animalistic reaction to their -- their (inaudible) righteous wrath, though it may be. *wrong doing.*
MR. OLSON: Mm-hmm.
MR. COX: But it would -- it would be a detriment to the war, and, so, because I believe you, that me losing everything and just walking away from it, get me your -- back to your friend's container and get smuggled through Canada with nothing but a gym bag and a rifle, and we lose everything and let the scales keep tipping, that's what I -- that's what I think has the brightest future for my -- for my family.
MR. OLSON: Mm-hmm.
MR. COX: Because only when there is no future and there is no hope for my wife and for my children can I then spend myself. Only in costing --
MR. OLSON: Mm-hmm.
MR. COX: -- the enemy.
MR. BARNEY: Mm-hmm.
MR. COX: Because costing the enemy is not my objective.
MR. OLSON: Yeah.
MR. COX: I would forgive them and have all sorts of redemption and go to a picnic with them if they'd leave me alone.
MR. OLSON: Yeah.
MR. COX: You know, I don't have hatred towards them.

26

(2/19/11 pp. 333-334)

## 18 U.S.C. §3553(a) FACTORS

## BACKGROUND OF SCHAEFFER COX

One of the primary factors the Court is directed to consider is the history and characteristics of the defendant. Beyond question, since 2008, Schaeffer Cox presented himself, and was presented by the government at trial, as an arrogant, boastful, prideful man who was ready, willing, and able to confront a corrupt government. He was full of hyperbole. That said, he is not the violent man who was portrayed throughout the trial. He talked of violence but never actually acted.

In actuality, he is a man who is seriously mentally disturbed and no one among his family, friends, law enforcement or his own defense lawyer recognized this. Friends and family wrote off his increasing paranoia as youthful arrogance. They did not see someone in need of long term mental health treatment. They simply saw someone who needed to be reigned in.

Schaeffer Cox was a family man- a loving husband to his wife and good father to his young son.[8] He was close with his father and mother. [9] He had demonstrated an exceedingly strong work ethic. Despite his relative youth he had built a thriving residential construction business, a solid home, and a respectable life for himself and his family. But behind the aura of success he was mentally deteriorating. He had led an insular life and had recently started to surround himself with older extremely conservative men who imparted to Schaeffer Cox viewpoints that only served to increase his feelings of paranoia.

---

[8] Mr. Cox daughter was born one month before he was arrested. In fact, Mr. Cox did not go to Anchorage with Lonnie Vernon and J.R. Olson as he stayed to care for his newborn daughter.
[9] Mr. Cox father was recently hospitalized with pancreatic failure and his prognosis is unclear.

27

Schaeffer Cox was born in Littleton, Colorado in 1984. Both of his parents were teachers. His father was a West Point graduate. Schaeffer Cox was one of 4 children. He and his two brothers and an older sister were home schooled by their parents. This was a close knit family that included the grandparents and many aunts and uncles in Colorado and Oklahoma.

As a boy Schaeffer's father took him fly fishing, hiking and mountain climbing throughout Colorado. In the winters he went skiing. Holidays were family events.

In 1999 the mass shootings at Columbine High School in Littleton, Colorado occurred. Schaeffer Cox knew some of the kids that attended Columbine and knew some of the victims of the shooting. This event caused Mr. Cox to believe the government could not be relied upon to protect its citizens.

Later in 1999 Schaeffer's father was offered and accepted a pastoral position at a small church in Fairbanks. Thus at age 16 Schaeffer and his family left their home and friends in Colorado and moved to Fairbanks.

Schaeffer Cox accepted the move and quickly learned to enjoy the offerings of Alaska. By age 17, Schaeffer had his sights set on climbing Mt. McKinley. He took classes in high altitude mountaineering and began rigorous training. Later that year Schaeffer and a close friend Roger Alexander, then age 62 climbed Mt. McKinley. The climb took 27 days.

Schaeffer Cox first started to collect firearms, particularly World War II memorabilia when he was 18. It was then that he built the replica Sten MK II that is the subject of Counts 4 and 5. He had never fired this weapon as it was viewed by him as a relic, not an operable firearm. At trial he fully admitted the possession of this firearm.

Following his completion of high school courses and a short period as a student at the University of Alaska Fairbanks, Schaeffer found work in the Alaska fishing industry and worked

on several different boats for the next two years. He then found work for a construction company at Ft. Wainwright. He learned to use the CAD system (computer assisted design) and operate heavy equipment and learned construction techniques and planning.

At age 18, Schaeffer met his wife Marti who was attending University of Alaska Fairbanks working on an engineering degree. This was his first serious romantic relationship.

In May and June of 2003, Schaeffer climbed Mt. McKinley for a second time with his father. This joint undertaking demonstrates the closeness between Schaeffer and his father.

Schaeffer Cox started his own residential construction company and a landscaping business in Fairbanks after apprenticing for one year with a successful general contractor.

In September of 2003 Schaeffer Cox and Marti were married. Schaeffer Cox was only 18 years old. They eloped to Maui and their marriage was strongly disapproved by Marti's mother.

In 2005 Schaeffer climbed Mt. McKinley for the third time with his wife Marti and his close friend Joe Nichols.

Schaeffer and Marti taught at a local Sunday School. They became licensed by the state of Alaska as foster parents and took in troubled children including the son of friend Richard Neff.

In 2008 after having distinguished himself when working as a Ron Paul supporter in the Fairbanks area, Schaeffer was urged to run for the Alaska State House of Representatives. He fully immersed himself in the campaign and lost a close election to a long- time incumbent. However the experience of campaigning was enjoyable and with the end of the campaign he continued to speak publicly about his perception of a financially out of control government.

At this time in his life, Schaeffer Cox began associating with a group of older, extremely conservative men who met regularly and espoused political and religious views that included

29

anti-government rhetoric. Schaeffer Cox was strongly influenced by these men and their beliefs to the point that he began parroting back the language and ideas they espoused without really understanding the meaning of the words and ideas being promoted. He was then encouraged to participate in the Second Amendment and Liberty Bell groups and finally to start a militia. He began to travel and speak to other extremely conservative groups in Montana and Idaho. His speeches became more and more anti-government and he portrayed more and more of a grandiose personality with claims of thousands of members of his militia armed with an arsenal of dangerous weapons-none of which was true. Supporters encouraged his outrageous rhetoric rather than express concern over his mental health.

### The turning point-Child Services Dispute

Up until the domestic assault charge and the Alaska Office of Child Services attempted interview with Schaeffer Cox young son Seth, Schaeffer Cox had been a law abiding positive member of the Fairbanks community. [10] But the lack of criminal history did not mean that Mr. Cox was not already beginning to exhibit signs of serious mental illness. When OCS showed up at Mr. Cox's home for an interview with his son, Schaeffer Cox became extremely paranoid and suspicious of law enforcement and the legal system. The domestic assault case had been resolved months before. Thus the appearance of the O.C.S. worker was a shock to Mr. Cox. He believed that rather than merely interview his young son, this was an effort to seize his son from their custody because of his political beliefs. His over-reaction to the OCS attempted interview was clear evidence of his increasingly paranoid view of the world around him.

This incident appears to be a turning point in Schaeffer Cox behavior. Until then, while he gave bombastic speeches, he never took any anti-government actions beyond his brash talk. With the OCS investigation, he truly believed there was a conspiracy to harm his family. He

---

[10] The OCS investigation was based upon claims of child neglect later determined to be unfounded.

30

began believing the effort to remove his son was a part of a wider conspiracy being waged against him. His paranoia included his trip to Ft. Wainwright with his wife seeking some type of protection. He also sought refuge with friends such as Richard Neff to whom he expressed fear of a government assault. He also told his father, Gary Cox, he though the government was trying to engage him in a shootout in order to kill him.

Mr. Cox's paranoia appears to have continued to fester and grow to the point that by the time of his March 10, 2011 arrest he had abandoned his home, property and business and began hiding at the homes of various friends. He made the decision to take his family and sneak out of Alaska. All of this reaction was far and away out of proportion to the misdemeanor concealed weapon charge and warrant pending against him in the local court. The fact that he took such drastic measures shows that he truly believed himself and his family to be in danger. While he had the State Court misdemeanor warrant pending as well, that charge, even had he been convicted would likely have carried no more than a suspended sentence and/or fine. It was certainly no reason for he and his family give up their home and go into hiding and plan to secretly leave Alaska. Schaeffer Cox's behavior provides additional evidence of his mental disorder.

It also seems evident the Schaeffer Cox got in way over his head in the so called militia movement with people who wanted to pursue violent acts way beyond what Schaeffer Cox ever intended. For example both Bill Fulton and Aaron Bennett (both government informants) tried to goad Cox into planning acts of violence in response to the efforts by O.C.S. to remove his son. But Schaeffer had no such plan and told Fulton as much in the face of knife wielding Fulton's threats to kill one of Schaeffer's companions Les Zerbe.

31

It also appears quite evident that Schaeffer Cox would say outrageous things to try to impress the more aggressive of the group of men he associated with. Yet, he never went so far as to implement any of the violent rhetoric.

## SENTENCING GUIDELINE ISSUES

*United States v. Booker*, 543 U.S. 220 (2005) established a new, independent limit on the sentence that may be imposed. The primary sentencing mandate of 18 U.S.C. § 3553(a) states that courts must impose the minimally sufficient sentence to achieve the statutory purposes of punishment-justice, deterrence, incapacitation, and rehabilitation:

> The court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. 3553(a)].

This directive is not simply a factor to be considered in determining sentence; it represents a cap above which the Court is statutorily prohibited from sentencing-even when a greater sentence is recommended by the Sentencing Guidelines, which per § 3553(a) are statutorily subordinate to this over-arching directive.

District Courts have been told not to place undue weight on the sentencing guidelines. The Guidelines are, not only no longer mandatory on the sentencing courts; they are also not to be presumed reasonable. *Nelson v. United States*, 555 U.S. 350 (2009). This means that the guidelines are but one of many factors to be considered by the court.

## SECTION 3A1.2 SHOULD NOT BE APPLIED (PSR ¶ 142)

The PSR sentencing guideline calculations include a 6 level enhancement because the intended victims were government employees. U.S.S.G. § 3A1.2 should not be applied in this case as to count 12(conspiracy to murder officers and employees of the United States) and count 16 (solicitation of others to engage in the murder of an officer of the United States) because the underlying charges not only incorporate the intended victim's status, but require as an element of the charges actual knowledge of the intended victim's status. Court's instruction 46 (elements of count 12) and instruction 52 (solicitation of others to engage in murder) each require the jury to find an agreement not just to murder a specific person but to murder "officers and employees of the United States." Therefore the base offense level designated for the underlying offense (U.S.S.G.§ 2A1.5) already takes into account defendant's knowledge of the victim's status. Thus to apply §3A1.2 would amount to impermissible double counting.

There are instances where double counting is improper. Impermissible double counting "occurs where one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines." *United States v. Speelman,* 431 F.3d 1226, 1233(9th Cir. 2005) (quoting *Reese,* 2 F.3d at 895); *see also United States v. Snider,* 976 F.2d 1249, 1252 (9th Cir. 1992) (double counting is impermissible where one Guidelines provision "is akin to a 'lesser included offense' of another," yet both are applied).

## SECTION 3B1.5(2)(b) USE OF BODY ARMOR SHOULD NOT BE APPLIED (PSR ¶ 138,144)

Paragraphs 138 and 144 of the PSR suggests the addition of 4 levels for use of body armor during the commission of the offenses in counts 12 and 16. However, those particular

counts cover very broad time periods rather than discrete events as do substantive counts. Count 12 covers the period between August 2009 and March 10, 2011 while count 16 covers the period between November 15, 2010 and March 10, 2011.

USSG 3B1.5(2)(B) which provides for a 4 level enhancement states : the defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense."

USSG 3B1.5(2)(A) which provides for a 2 level enhancement states: the offense involved the use of body armor.

Section 3B1.5 of the Guidelines provides a four-level enhancement if: (1) "the defendant was convicted of a drug trafficking crime or a crime of violence" and (2) "the defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense." "Use" is defined as "active employment in a manner to protect the person from gunfire." U.S.S.G. § 3B1.5 cmt. n.1. This guideline requires the active employment of the bulletproof vest to protect oneself from gunfire during the commission of the offense or in preparation or in an attempt to escape after the offense.

The rationale for this guideline appears to be that during a violent confrontation a person committing such an offense while wearing body armor may be emboldened. Here there were no violent confrontations and no immediate plans to engage in such a confrontation. The government conceded in closing argument that: " We're not telling you that it was going to happen today, that it was going to happen tomorrow, that it was even going to happen next week. Because the fact of the matter is, this whole case is about when we're going to be strong enough." (Trial Day 22-4)

34

The wearing of body armor while moving weaponry or while visiting R.W. or even on March 10, 2011 is not sufficient. For example if there had been an actual attempt to commit the murder of a government official, then this enhancement would clearly apply. Moving weaponry is not a crime of violence. The visit to R.W. was for the purpose of Mr. Cox seeking advice about his ongoing criminal case and warning R.W. about the intentions of some militia members. On March 10 although arrested while being shown illegal silencers and grenades, it is clear Mr. Cox believed he was also going to meet with the trucker who was to transport Mr. Cox and his family out of Alaska. Mr. Cox was not then preparing to imminently attempt any murder of government officials. Mr. Cox was acquitted in counts 7 and 15 of carrying a firearm during and in relation to a crime of violence including counts 1 & 12. Given those not guilty verdicts, and the fact that Mr. Cox routinely carried a firearm and also regularly wore body armor it appears that the jury believed that there was no discrete crime of violence that was committed but only a conspiracy to do so at some indeterminate time in the future.

### SECTION 3C1.1 ENHANCEMENT FOR OBSTRUCTION SHOULD NOT BE APPLIED (PSR ¶ 125, 139, 145)

The probation office and the government have argued for the Court to impose a two-level enhancement pursuant to U.S.S.G. §3C1.1 based upon Mr. Cox's trial testimony.[11]

Sentencing Guideline 3C1.1 provides for a two-level increase in the offense level if a defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice. An example of obstructive conduct is "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1 cmt. n.4(b). A witness commits perjury if he gives false testimony under oath or affirmation, "concerning a material matter, with the willful intent to provide false

---

[11] The government made a similar argument at the sentencing hearing of Mr. Barney. The court rejected that argument and did not apply this enhancement against Mr. Barney.

testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993); see 18 U.S.C. § 1621. The sentencing judge need only find by a preponderance of the evidence that the defendant committed perjury. See *United States v. Tidwell*, 191 F.3d 976, 982 (9th Cir. 1999).

In *United States v. Dunnigan*, 507 U.S. 87, 98 (1993), the Supreme Court held that, "[u]pon a proper determination that the accused has committed perjury at trial," the accused's trial testimony can supply the basis for application of the § 3C1.1 enhancement. To decide when an accused's testimony constitutes perjury, Dunnigan adopted the federal criminal definition of perjury set out in 18 U.S.C. § 1621. Dunnigan, 507 U.S. at 94. Under that definition, "[a] witness testifying under oath or affirmation [commits perjury] if, she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." Id. (citing 18 U.S.C. § 1621(1)).

If an accused challenges a § 3C1.1 sentencing enhancement based on the accused's testimony at trial, the district court must make factual findings that satisfy all three elements of perjury-falsity, materiality, and willfulness-contained in 18 U.S.C. § 1621. Id. at 96-97.

The mere fact that a defendant is convicted is not, in and of itself proof of obstruction. As the Court stated in *Dunnigan* at 95, "[A defendant's] testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent."

As a result of Mr. Cox's mental illness he did not accurately perceive the world around him. He had no appreciation for how his words sounded to others. He did not have the ability to accurately recall events because his view of the world was so distorted by his paranoia. Thus it

36

is difficult to be able to state that because his testimony about events differed from others, that he was willfully fabricating.

Mr. Cox truthfully admitted the possession of the homemade silencer and the Sten machine gun. He was acquitted of the 924(c)charges contained in counts 7 and 15.

In defendant's objections to the presentence report [Exhibit A], we address in some detail a response to the specific claims that Mr. Cox willfully committed perjury. While Mr. Cox testimony, at times was contradicted by other witnesses, that does not mean he willfully lied.

This Court addressed this same issue during the Coleman Barney sentencing where the Court stated:

THE COURT: Okay. Well, this is another, I think, slippery slope in the guidelines, and it -- the Government here asked the Court to look at everything that Mr. Barney did or said that might be challenged by other evidence in the
case. There is a big difference between purposely, intentionally, willfully lying and having a convenient memory. People tend to want to believe that things happen they way they wished they happened. People give testimony all the time that is challenged and found to be not true by a finder of fact. That in and of itself does not justify an obstruction of justice enhancement under the guidelines.(Barney Sentencing Transcript p 26)


## PARTIAL ACCEPTANCE OF RESPONSIBILITY AS TO COUNTS 3,4,5, & 6

Mr. Cox gave testimony directly accepting responsibility for possession of the homemade silencer (Counts 3 & 6) and the Sten machine gun (counts 4 & 5). He also acknowledged that all of the materials located in the white trailer belonged to him including the Hornets Nest canisters and the launcher. (count 13). He should receive some credit from accepting responsibility for the charges related to these items. As for the conspiracy to commit murder and solicitation of murder he has consistently denied those charges.

## ROLE IN THE OFFENSES

The government and the probation office assign Mr. Cox a 4 level leadership role. (PSR 137, 143)While Mr. Cox certainly believed that he had a leadership role in the Alaska Peacemakers Militia the issue for sentencing is what role did he have over others in the actual offenses. In fact Mr. Cox seemed to believe he was the leader of a 3500 person militia when his "followers" amounted to no more than one or two people. Mr. Cox mental illness caused him to inflate his influenced over others. However, he actually lacked leadership capacity. Mr. Cox had no real leadership role over Mr. Vernon. Vernon had his own separate dispute with the government over his own IRS issues. Mr. Cox did have some leadership role over Mr. Barney but as the jury did not find Mr. Barney guilty of court 12 (conspiracy to murder government officials) it follows that Mr. Cox did not have a leadership role over Mr. Barney as to that charge.

Moreover, the overall perception of Mr. Cox as a leader was misplaced. The psychological testing results demonstrate he is, in fact, easily manipulated by others and overestimated his own capabilities. He was thus readily accepted without question world views and philosophies espoused by others. He often parroted back rhetoric he lacked the capacity to understand.

## SENTENCING ENTRAPMENT

Mr. Cox was indicted by the State of Alaska on February 14, 2011. However, the government chose not to arrest him but to continue the efforts of CI-1 to get Mr. Cox to come up with a plan of violence for nearly one more month until the arrest on March 10, 2011. By

February 14th, however, Mr. Cox was already planning to leave Alaska and would have left much sooner if he had not been delayed by the government ruse.

As to count 2 possession of an unregistered destructive device (hand grenades) and count 3 (possession of an unregistered firearm-silencer) in this case the government, through informants, acted as both the supplier and in part the buyer of these devices. Government informant Bill Fulton offered to sell both the silencers and the grenades. Government informant J.R. Olson acted as the facilitator with Fulton and thereafter solicited the sale of these devices and encouraged Cox to buy the devices. Olson told Mr. Cox that Fulton would not take the items back if Cox refused them. Olson said he would keep the items for himself if Cox declined them. To further entice Mr. Cox, Olson said that Fulton would accept virtually any monetary offer and would take 'whatever we give him." (Govt Ex 38-5). Since the government chose to arrest Mr. Cox and Mr. Barney before they took possession of the silencers and grenades and before money changed hands, it is not at all clear that Mr. Cox would have completed the transaction. Mr. Cox's primary concern was meeting the trucker in order to expedite leaving Alaska.

The government considered using this March 10 2011 "buy/bust" as a vehicle to enhance Mr. Cox's sentence rather than as a means to further investigate. In an e-mail dated March 2, 2011 the AUSA wrote:

The US Attorney and I concur with the possible plan to provide Cox with additional grenades. …... Given the short timeframe, I don't have the time to
adequately research whether this would provide additional sentencing enhancements, but it could, but how much is unknown to me at present. On the surface, it would provide another charge of 5861 which would, in theory, provide another ten year max sentencing structure since they are distinct from the one already possessed. Given that I understand that Cox ordered these I don't see an issue with sentencing entrapment.
-Steve
Steve Skrocki
AUSA/ATAC Coordinator

39

Prior to the March 10, 2011 buy/bust arrest the AUSA inquired as to what sentence Cox would face in state court based on the current state charges.

Sutherland, Richard A, Jr.
Gray, Michael (LAW)
RE: Palmer
Monday, February 28, 2011 3:45:08 PM
AUSA Steve Skrocki would like a ballpark figure (presumptive ranges) of what Cox, Barney, and the Vernons would be sentenced to if they were convicted on the charges in the complaint with no new charges based on the searches.

Sentencing entrapment, while most often recognized in federal drug cases can also be applied in a case such as this where the government has encouraged conduct seemingly solely for the purpose of increasing the potential criminal sentence rather than for legitimate investigative means. Sentencing entrapment occurs in reverse sting situations such as herein where government conduct leads a defendant predisposed to deal in a lesser crime to deal in a larger more serious criminal venture. See *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir.1994)("sentencing entrapment or sentence factor manipulation occurs when a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment."); *United States v. Stuart*, 923 F.2d 607, 614, (9th Cir.) cert. denied, 499 U.S. 967 (1991);*United States v. Searcy*, 233 F.2d 1096 (8th Cir. 2000).

The evidence presented at trial was that Mr. Cox intended to leave Alaska with his family. He was deliberately delayed by the government so that the government could set up the buy/bust involving the silencers and grenades. Had Mr. Cox not been delayed he would never have been present for this buy/bust.

40

## THE GUIDELINES OVERSTATE THE SERIOUSNESS OF MR. COX CONDUCT

But for the government's attempt to sell Mr. Cox "real" grenades and silencers, Mr. Cox actual illegal weapons "arsenal" was quite meager. He had a homemade silencer made from a garden hose. He had a World War II relic machine gun that he maintains he was never able to fire. He had some legally purchased Hornet's Nests and 37 MM launcher.

The government itself conceded in closing argument that the alleged conspiracy to commit murder/solicitation of murder were remote.

The reason we're here this morning is because you've seen over the past six weeks evidence that these three individuals are working on a plan, they're working on another form of government. And in the long term, we're not telling you it was going to happen today, that it was going to happen tomorrow, that it was going to happen next week. Because this whole case is about when we're going to be strong enough. (Govt Closing Arg. P. 4)

Mr. Cox, while having spoken of violent acts never acted. When push came to shove he ran, or at least tried to. He had packed up his family, abandoned his home and was clearly intent on leaving the state. So for all his harsh talk, he never engaged in any actual violence and no one was ever physically harmed in any way.

## THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITY

In this case there was a deliberate and carefully considered decision on the part of the U.S. Attorney to charge Mr. Cox in a venue (federal court) where he was likely to receive the longest sentence. There was a comparison of the time Mr. Cox would have faced had he been charged by the State of Alaska versus the time he would face in the federal system. The U.S. Attorney elected to prosecute Mr. Cox in the federal court system to achieve a more severe sentence.

There may be some attempt to equate or compare Mr. Cox convictions with those of Lonnie Vernon. However, Mr. Vernon was convicted, in addition to the charges in Mr. Cox case, to a separate conspiracy to kill a federal judge and the judge's family, with whom he was angered over his own IRS dispute. Mr. Vernon had a detailed plot to kill this judge and his family and had gone so far as to write a suicide type letter to his family-evidencing the imminent nature of his plan. Mr. Cox had no part in that plan. Mr. Cox's only imminent plan was to leave Alaska with his family. In fact he would have left sooner had the government not delayed his departure with the ruse of the delayed trucker.

Mr. Cox's conduct was certainly greater than that of Coleman Barney, but it was of the same type as Mr. Barney. Mr. Cox had a greater role in the offenses than Mr. Barney but Mr. Barney was a participant in the KJNP event, the 2-4-1 discussions, and the weapons offenses were similar. Indeed both men were together on March 10 during the buy/bust involving the silencers and grenades. Both men have minimal criminal histories, strong work histories, and strong family responsibilities. Unlike Mr. Barney, however, Mr. Cox's behavior was in large measure attributable to mental illness. A sentence of 10 years being double the sentence that Mr. Barney received would be a proper avoidance of unwarranted disparity

## LETTERS OF SUPPORT

A large number of family, friends and acquaintances have written letters of support describing the Schaeffer Cox that they have come to know over a period of many years. To a person, none of the writers believe that Schaeffer Cox was capable of actually engaging in the kinds of violent acts that he was heard to speak of. Those who knew Schaeffer Cox discounted

42

his increasingly bizarre rhetoric and did not recognize the underlying mental illness. Some who see themselves as his supporters were actually further encouraging his paranoia. The writers of these letters include a retired professor emeritus of Accounting, a Fairbanks fire fighter and police officer, a Fairbanks paramedic, a youth pastor, an adult pastor, former and current soldiers, business owners, senior vice president of a local bank, licensed home builders, fellow church parishioners, customers of Mr. Cox construction and landscaping businesses and others. While the government will be quick to point out that these writers did not see the side of Schaeffer Cox that was captured on the undercover recordings, these folks did see Mr. Cox in a wide variety of contexts over many years. They saw him at work, socially, and with his family. They saw how he treated other people. They came to know him quite well.

A few notable examples include:

Levi Roth who has known Schaeffer Cox for 29 years writes:

There was once a time in my life when I was homeless and had almost nothing. Schaeffer let me stay in his house provided me with food and gave me time to find a good place to live. After all he did for me he asked for nothing in return because he believed it was the right thing to do. He has not only done these types of things for me but for many others as well.

Joseph Nichols who has known Schaeffer Cox for 12 years writes:

I have to say that when it comes to the character of a man, I have had a hard time finding people who were as hard-working, reliable, and trust-worthy as Schaeffer Cox. He is disciplined, caring and empathetic to others. He has always loved his wife and family. He has run more than one small business and owned a home all at a surprisingly young age.

Charles Deer:

Shortly after Schaeffer got married he started his own construction business. He would frequently ask me for advice. Again, I was struck with how capable and astute he was in the principles of management and fiscal constraints.

Myra Neff who met Schaeffer Cox when he was 16 years old:

43

Through the years I observed Schaeffer's worthy community contributions and personal achievements; he taught an ESL class, he led the college and career group at church; he summited Mt. McKinley three times, he ran for political office; he was active in his political party; he bought his own home; he became a business-owner; he was financially astute; he bought a commercial fishing boat; he was a responsible loving husband and father... all this before the age of 26.

Diane Shoming who met Schaeffer Cox in 2000:

The most pronounced thing I observed about Schaeffer was his willingness to help my extended family when my nephew was in rebellion against his parents. Schaeffer and his wife took my nephew into their home and assumed full custody for him without any expectation of reward for doing so. Schaeffer exceeded our expectations in his guardianship of my nephew.

Barbara Roberts, whose husband is a TSA employee:

My husband, Larry Roberts, has worked for TSA for the last ten (10) years and continues to work there presently. I have heard many conversations between my husband and Schaeffer regarding TSA and have never felt threatened whatsoever from Schaeffer. As I said before, Schaeffer expresses his opinions openly. He enjoys debating with others.

Pable Coss who first met Schaeffer Cox when he hired him to do a home repair:

I met Schaeffer sometime in 2006 when somebody referred him to me as someone who conducted home repairs. I hired Schaeffer to fix a leak in our bathroom. It took Schaeffer about 3 hours to get the repair done, and even though I insisted, Schaeffer would only charge us $100.00 for the job. Part of the reason the job took a long time is that Schaeffer needed a special tool which he did not have when he first arrived at the house and he had to make a second trip. Other contractors would have used this opportunity to make excuses and take advantage of me and charge me a lot more than $100.00. Schaeffer decided that honesty and customer satisfaction were more important than making more money.

Joshua Browning who has known Schaeffer Cox for 10 years:

Schaeffer is a smart and hardworking man. I'm sure he could've done just about anything he wanted to in life. Schaeffer is a very passionate person and sometimes he can be misunderstood. Yes, he can be loud and in your face at times, but this is just the way he is.

Melissa Browning:

My husband and I even went to help him [Schaeffer] on a job one day for an elderly woman who had hired him to replace all of the windows in her house on a day when the temperatures were hovering around zero degrees Fahrenheit. The elderly woman, while sweet, was very particular.

I just remember being impressed at how patient and compassionate Schaeffer was with her and how he answered all of her questions without showing any kind of frustration. He also did a great job replacing each window quickly so the poor old lady wouldn't have to lose more heat from her house than necessary.

Timothy Byrnes:

When our youth pastor was unable to attend a planned youth revival in Anchorage due to a deployment by the Army, Schaeffer and his wife Marty agreed to step up and worked with the teenagers the entire week. We were on that trip. My daughter and son were a part of the forty youths who traveled with us to Anchorage while I drove the church bus. Schaeffer was very devoted to helping the kids develop throughout the entire trip. And I've never had a more well organized and enjoyable road trip than that one.

Jeanine Smith:

I co-chaperoned a youth trip with Schaeffer and his wife, along with some other adults. During the trip, some of the youth boys were "playing" hard in the facility where were staying and ran into a wall; causing some minor damage. Even though it took quite a bit of time away for the other activities, Schaeffer took it upon himself to diligently and skillfully lead the boys to repair the damage to the wall. He took responsibility even though he did not cause the damage and he followed through leading the boys with the work until it was complete.

## CONCLUSION

Unlike many defendants that come before this Court for sentencing, Schaeffer Cox' livelihood was not based on crime. He didn't steal or sell or use drugs. His actions were not based on greed. He has no history of violence. He always had legitimate employment. He paid his taxes. He went to church. It appears that the jury found that he went from being an overzealous and outspoken government critic to one who crossed the legal boundary into criminal territory. However he never actually engaged in any violent acts toward the

45

government or any individual.[12] What the jury never heard about Schaeffer Cox was that as he was making his outrageous statements he was mentally ill and that this illness was a significant force behind his conduct.

As to future dangerousness and treatment Dr. Ladue writes:

Mr. Cox needs mental health treatment for the rest of his life. He needs to be protected from people who instigated and supported his delusions, and his needs to be monitored closely to ensure he is taking the appropriate medication. These goals can well be achieved outside the range of a long prison term. Mr. Cox, rather than being a domestic terrorist, is a man with a severe mental illness, whose grandiose thoughts, disorganized and delusional thinking, and less then helpful acquaintances placed him in the position in which he now finds himself. Hopefully, the court will consider the factors raised in this report and consider an appropriate sentence for Mr. Cox that would include close adherence to all requirements of a mental health program.

A sentence of 10 years to a man who has never been convicted of a felony offense or been to prison is a harsh punishment made even more so because Mr. Cox has two young children he will not see except in prison visiting rooms for many years. Moreover, Mr. Cox is in need of mental health treatment that will be difficult to receive in a prison setting. Upon release he will be a convicted felon. Such a sentence is sufficient, but not more than necessary to achieve the statutory sentencing goals.

Dated this 1st day of January, 2013.

/s/Peter A. Camiel
Peter A. Camiel
Attorney For Defendant
710 Cherry Street
Seattle, WA 98104
(206)624-1551
petercamiel@yahoo.com

---

[12] At paragraph 223 of the PSR under the section regarding factors that may warrant a sentence outside the guideline range it is noted that: "While the defendant's conduct was serious, no actual physical harm to the targeted victims occurred. To date, it is not clear that the defendant understands how his conduct could have resulted in physical or psychological harm to others."

Supplemental Exhibit

Part 3(C)



LAW OFFICE OF ROBERT JOHN
P.O. Box 73570
Fairbanks, Alaska 99707
907-456-6056
907-456-6057 FAX


November 12, 2013


Suzanne Lee Elliott
Attorney at Law
1300 Hoge Building
705 Second Avenue
Seattle, WA 98104-1705

      Re:    Schaeffer Cox
              Suppression & Dismissal Issues
              Jury Instructions
              Right To Testify

Dear Suzanne:

      Since our conversation, I have taken some time to update the research I did in relation to the motion to suppress and to dismiss at Docket 172. As you are faced with the daunting task of digesting the mammoth record and then determining what to include in the Appellant's Brief, I have attached copies of the memorandum I drafted at Docket 172, Schaeffer's corresponding affidavit, and the supplemental addendum filed at Docket 234. The following are my thoughts on the suppression-and-dismissal issues in view of my research through November 9, 2013. I have included my observations on a few other issues as well. I hope you will find at least some of them to be helpful.

      One thing that surprised me about the government's response to the motion to suppress and to dismiss was that the government made little effort to dispute the facts. There was no affidavit from J.R. Olson or anyone else to dispute what Schaeffer said. Perhaps that is not surprising since the government's own records evidenced the trucker ruse and Schaeffer's exhausted state at the time. In any event, because the government bears the burden of proof (at least as to the warrantless-search-and-seizure issues),[1] and Schaeffer had thoroughly articulated his actual and reasonable expectations of privacy in

---

[1] See United States v. Cervantes, 703 F.3d 1135, 1141 (9th Cir. 2012); United States v. Vangxay, 594 F.3d 1111, 1119 (9th Cir. 2010).

November 12, 2013
Page 2

his affidavit,[2] and there did not appear to be a dispute about the underlying facts, we did not request an evidentiary hearing.[3] As I recall, when we argued the motion to the Court, AUSA Skrocki did not address the issues in the motion, but instead went on and on about what a dangerous man Schaeffer was.

Having now updated the research, I continue to be struck by the fact that the actions of J.R. Olson in restraining Schaeffer to Fairbanks are above and beyond anything I found an "invited informer" or other government agent being allowed to do. Olson certainly must have panicked when Schaeffer announced he was leaving on February 19, 2011, but Olson's desire to save himself from punishment cannot justify Olson removing the battery from Schaeffer's vehicle and perpetrating the trucker ruse to keep Schaeffer in Fairbanks till March 10.

The two cases and the treatise I cited in the supplemental memorandum indicate that a ruse premised upon misrepresenting the government agent's purpose negates the necessary consent where the misrepresentation involves duress or coercion or otherwise prevents the individual from fairly assessing the need to surrender his or her privacy.[4] Although a subsequent Ninth Circuit case appears to undermine somewhat the arguments I made about J.R. Olson's warrantless audio-and-video recording,[5] the Fourth Amendment arguments involving invited informers and consent by deception remain sound.

As to dismissal of the charges, an October 23 Ninth Circuit case, United States v. Black, 2013 5734381, _____ F.3d _____ (9th Cir. 2013) thoroughly reviews and discusses the "outrageous government conduct" doctrine in the Ninth Circuit and includes a stinging dissent. I think that a strong argument can be made that the government's actions toward Schaeffer through J.R. Olson (and Bill Fulton) substantially exceed the

---

[2] See United States v. $40,955.00 in United States Currency, 554 F.3d 752, 756 (9th Cir. 2009).

[3] See United States v. McTiernan, 695 F.3d 882, 891 (9th Cir. 2012); United States v. Quoc Viet Hoang, 486 F.3d 1156, 1163 (9th Cir. 2007).

[4] See United States v. Phillips, 497 F.2d 1131, 1134-35 & n.4 (9th Cir. 1974); United States v. Hardin, 539 F.3d 404, 424-25 (6th Cir. 2008); 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King, and Orin S. Kerr, Criminal Procedure, §3.10(c) at 421-22 (3rd ed. 2007); cf. United States v. Nerber, 222 F.3d 597, 605 n.10 (9th Cir. 2000) ("[E]very 'invited informer' case we are aware of involved a defendant voluntarily sharing his words or revealing his actions to a government.")

[5] See United States v. Wahchumwah, 710 F.3d 862, 867-68 (9th Cir. 2013).

November 12, 2013
Page 3

bounds permitted by the <u>Black</u> Court. Just as Judge Noonan's dissent in <u>Black</u> emphasized that the government should not be allowed to lead its citizens into temptation, I would argue that the government should not be allowed to seize (or kidnap) its citizens into temptation.

From our conversation, it is my understanding that you have concluded that there is a sentencing-entrapment issue in the case. In that regard, a recent Ninth Circuit case indicates that at least in certain circumstances, sentencing entrapment must be determined by the jury and not the court.[6] At the oral argument on the motion to suppress and to dismiss, Judge Bryan, to my recollection, ruled that Schaeffer's entrapment-by-estoppel claims would need to be decided by the jury.[7] Since I was not at trial, I do not know what evidence was presented as to -- or how (if at all) the jury was instructed on -- entrapment by estoppel or sentencing entrapment. At the time of the hearing on the motion to suppress and to dismiss, it did seem to me that Schaeffer had at least a colorable entrapment-by-estoppel defense as to the homemade silencer, and perhaps as to the weapons placed in his possession on March 10, 2011 as well.[8]

Among the other potential issues in the case that come to my mind are the jury instructions relating to conspiracy. I did some research and helped Nelson draft an instruction or instructions that indicated that one could not be guilty of conspiracy where the object of or condition upon which the conspiracy would come to fruition did not exist or had no possibility of occurring.

A final thing that comes to my mind at this time is a call that I got from Schaeffer during trial. Schaeffer told me that Judge Bryan would not let him testify except through questions elicited through Nelson. I did not then and have not now researched the issue, but it seemed that if under the United States Supreme Court's decision in <u>Rock</u> the right and the decision whether to testify are the accused's and not the attorney's to either assert or waive, an argument could be made that the accused's assertion of the right to testify should not be fettered to the questions his attorney chooses to ask.

---

[6] See <u>United States v. Cortes</u>, 732 F.2d 1078, 1088-92 (9th Cir. 2013). Interestingly, <u>Cortes</u> is not mentioned in the <u>Black</u> decision which was issued only two weeks after <u>Cortes</u>. The <u>Black</u> Court instead treated sentencing entrapment as a determination to be made by the judge during the sentencing process.

[7] See <u>United States v. Schafer</u>, 625 F.3d 629, 635-37 (9th Cir. 2010).

[8] See <u>Cortes</u>, 732 F.3d at 1084-85 (discussing a criminal defendant's entitlement to jury instructions relating to a defense theory and appellate review of the trial court's failure to give such instructions).

November 12, 2013
Page 4

  In conclusion, I hope you do not find it presumptuous of me to offer so much input into Schaeffer's appeal. He is my friend; I am most concerned about the dangerous precedent and threat to liberty set by the government overreaching allowed so far in this case; and I have devoted an extensive part of my practice to handling appellate matters, State and federal. Ultimately, the decision of what to pursue on appeal is yours as an experienced and distinguished appellate attorney. My hope is that this makes your decisionmaking easier and increases Schaeffer's chances of prevailing.

  If you have any questions, do not hesitate to call or otherwise contact me. I plan on being out of the office from December 21 through January 12, and will be extremely busy trying to get things done before I take off, but I will make every effort to discuss Schaeffer's case with you or review drafts of the brief if you are interested.

      Sincerely,

      /s/ Robert John

      Robert John

RJ/ml

Francis Cox, #16179-006
USP Marion CMU
PO Box 1000
Marion, IL 62959

10-29-13

Law Offices of
Suzanne Lee Elliott
705 2nd Ave.
Hoge Building, Suite 1300
Seattle, WA 98104

Re: Case #13-30000

Dear Suzanne,

In regards to my trial testimony. I was so scared that if
I told one lie on anything the jury would think I was lying on
everything and convict me on the big charges, that I told the
truth on everything, even that certain stuff in Barney's house
was mine when they couldn't prove it. I kept telling Nelson that
I didn't want the jury to have to take my word for it and that we
needed to present evidence to go along with my testimony. He
hadn't prepared any exhibits for trial. But he told me that was
okay because I was telling the truth and juries can just tell when
people are telling the truth. Apparently he's wrong, but Rolly
Port, Tim Dooley, and Robert John can all tell you I was honest in
my trial testimony. They knew I was telling the truth because they
had gone through the discovery. Nelson told me it was too much
work to piece the story together exhibit by exhibit, so he was
just going to have me explain it to the jury. If he had done his
job, the whole case could have been won by crossing the government's
witnesses with audios. I probably wouldn't even have had to take
the stand. It would have all rested on black and white exhibits
and my credibility wouldn't have even been a factor. That's what
Dooley did for Coleman and he didn't get convicted.

The FBI spent over a year trying to build up my fight or
flight instinct in hopes they could then panic me into plotting a
crime. They scared me with the constant fearmongering of J.R. Olson.
They scared me by Aaron Bennett saying in '09 he's going to kill
me if I didn't go along. They scared me and triggered my parental
instincts when they sent Fulton up to exploit the child welfare
case. They scared me by FBI snooping around town about me. They
scared me by talking about killing me in front of the MP's who
told me. They scared me by arresting people in other states over
this sovereign citizen crap. They scared me when Steve Cooper said,
"yah you need to be careful to not get killed." They scared me
when the troopers wouldn't look into Fulton, and Bennett became
more influential in the militia than me. They scared me when Fulton
gave me one final do or die ultimatum for Feb 14th 2010.

Suzanne Lee Elliott
October 29, 2013
Page 2

I know we talked about some horribly scary stuff, like "241,"
but we were horribly scared!  And it's not like that stuff was
our idea.  The informants brought it up once my panic had reached
a fever pitch.  They successfully got us to talk about the stuff
they brought up.  I know that and I regret it with all my heart.
They did an expert job of setting off my fight or flight reflex.
But after talking it over and a whole bunch of thinking out loud
I decided to run for my life because "That's what has the brightest
future for my family" (Feb 19th 5:34:50) and "That no fruit would
come from 241"(Feb 19th 2:41:50) and "We just need to have a policy
of, of avoiding Aaron and his pack, because that is just, that is
a bunch of hedonistic, scrappy, um, directionless brawlers." (Feb
12th 2:36:34) and "I'm trying to avoid there being bloodshed." (March
1st 0:11:18) and "I don't want [pause] I don't want to hurt any-
body." (Feb 19th 2:37:32) and "I guess that's kind of the thing.
I'm getting out of here." (Feb 19th 2:25:10)

Suzanne, starting with the introduction of Aaron Bennett in
late 2008 they manipulated my environment until it was such a
horrifying nightmare that I couldn't eat, sleep, or think.  I
couldn't handle what thay were doing to me.  I was in the middle
of a terrified mental breakdown.  Fulton's death threat ultimatum
that I got on Feb 6th put me over the edge and I lost all composure.
I didn't know what was going on, all I knew was that I had to get
out of this country, away from the threats and the danger and clear
my head.  That's what Coleman Barney, Ken Thising, the Vernons,
myself and even JR who was going to arrange the "trucker," AGREED
to on Feb 19th.  We AGREED to get me out of the country to avoid
problems with Bill and Aaron or the government.  There was no other
AGREEMENT!  That's a fact the evidence clearly supports.  And you
can prove it with Dooley's motion for a Frank's Hearing and Camiel's
sentencing memo and PSR objections.  You won't find it in the trial
transcript because Nelson Traverso wet the bed.  But we'll just
have to find a way to work around that.

Robert John would love to talk with you but he wants you to
call him.  His number is (907) 456-6056.  He knows this case as
well as anybody.  Rolly's reports will really help, probably even
more than my notes on the trial transcript could.  So do track
those down and read them.

I think the best way to beat the weapons charges is to win the
supression motion on the trailer, which is stronger than you might
think.  I don't know how best to beat the conspiracy and solicitation
of murder charges, but I never planned to murder anybody and I
certainly didn't agree to anything with someone else, except to leave
town.

Suzanne Lee Elliott
October 29, 2013
Page 3

The test for "outrageous government conduct" requires only one of the conditions be met. Either the use of severe physical or psychological coercion OR the crime was created solely to convict the defendant. You'll know best what will fly in the 9th, but I fit both of those perfectly.

I included some highlighted transcripts, a copy of an email I sent you and my notes on the audio exhibits played at trial. I'll keep my notes on trial transcripts coming.

Keep in touch,

Schaeffer

Francis S.Cox, #16179-006
USP Marion CMU
PO Box 1000
Marion, IL   62959

Sep 20th 2013

Law Office of
Suzanne Lee Elliott
1300 Hoge Bldg
705 2nd Avenue
Seattle, WA   98104

Re:  Case 13-30000

Dear Suzanne,

I have just received your letter dated Sep 16th 2013.  Thank
you for your reply.  As to Mr. Skrocki's knowing and intentional
deceit, I believe that if you familiarize yourself with the discovery
and pre and post trial filings you will find that it in fact is a
"cakewalk" to prove.  Not only do we have witnesses testifying to
the exact opposite of the audios and then Skrocki objecting when
we try to play the audios to show the jury the truth, we have emails
from Skrocki to SA Sutherland saying basically, we don't have any
reason to believe Cox is going to do anything except leave the
country.

Please, please don't adopt the government view and "disagree"
with me without basis.  I know most of the people you deal with are
guilty but I am not.  If the truth had come out in this I would
have been stuck with possession of the Sten and the gardenhose
silencer, which may or may not have had a technicality defense.
That's it.  The rest is empty hype they created themselves.  Are
you able to see that?

I've attached what I have so far from going over the transcripts
of trial.

Sincerely,

Schaeffer

Mailed 9-23
2013

USP Marion CMU
PO Box 1,000
Marion, IL 62959

LAW Office of
Jon Zulauf
Hoge Bldg, Suit 1111
705 2nd Ave
Seattle, WA 98104                    Sep 20th 2013

Re: Cox, case # 13-30000

Dear Jon Zulauf,

I had talked to you briefly while I was in
Seatac last year. Mr. Peter Camiel was representing me
for sentencing at that time. He is a good man
and a good attorney.

After sentencing I was passed off to Mrs.
Suzanne Elliott for direct appeal. While I
understand she is a very well known attorney, my
opinion is that she is not well suited for this
case. I am very uncomfortable proceeding with
her as my counsel. However, trial bankrupted me
and my whole family & I'm not sure what
my other options may be. Do you do
CJA work and if you do does this case
interest you?

I have included my story, excerpts from
sentencing memos and some transcripts of audios
the jury never got to hear.

If you are inclined to help some how, please
write me back.

Thank you from my heart,

— Schaeffer Cox

LAW OFFICE OF
## Suzanne Lee Elliott
1300 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104

TELEPHONE:　　　　　E-MAIL: SUZANNE@SUZANNEELLIOTTLAW.COM　　　　　FAX:
(206) 623-0291　　　　WEBSITE: WWW.SUZANNEELLIOTTLAW.COM　　　　(206) 623-2186

September 16, 2013

Francis Schaeffer Cox
#16179-006
US Penitentiary Marion
PO Box 1000
Marion, IL 62959

Dear Schaeffer:

　　　　Thank you for your letter of September 8, 2013. First, if we need more time to complete a rational brief in your case, we will ask for it from the Ninth Circuit. I have just begun to review your transcripts.

　　　　If there are *Brady* violations apparent from the record as presently developed, then we can certainly raise arguments about the government's failure to provide you with all of the exculpatory evidence in the case. But, I caution that while you believe some of the witnesses' testimony was "perjurous," the government's point of view is that these witnesses were telling the truth. I disagree that it would be "a cakewalk" to prove that Mr. Skrocki knew the truth, covered it up, and had his witnesses lie. Please be advised that I personally read all of the letters sent to me. My staff sometimes reads them after I have read them in order to copy materials and provide you with information that you have requested. As to your letter that you sent out to selected friends and supporters: I do not believe that this kind of material helps you at all. It will be read by the prison staff and provided to law enforcement officials or U.S. Attorneys, including those who prosecuted your case. Specifically, I want to point out that you should not be discussing the evidence, your defense, the psychiatric evaluation that you underwent before sentencing, or your current circumstances. If we win a new trial, making statements about these issues will come back to haunt you.

　　　　Thank you for your kind attention to this matter.

　　　　　　　　　　　Sincerely,

　　　　　　　　　　　Suzanne Lee Elliott
　　　　　　　　　　　Suzanne Lee Elliott
　　　　　　　　　　　Attorney at Law

SLE:wb

LAW OFFICE OF
## Suzanne Lee Elliott
1300 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104

TELEPHONE:
(206) 623-0291

E-MAIL: SUZANNE@SUZANNEELLIOTTLAW.COM
WEBSITE: WWW.SUZANNEELLIOTTLAW.COM

FAX:
(206) 623-2186

September 3, 2013

Francis Schaeffer Cox
#16179-006
US Penitentiary Marion
PO Box 1000
Marion, IL 62959

Dear Schaeffer:

Thank you for the updated email and for the list of issues. I believe that the first four likely have legs in the appeal. As to number 5, "Outrageous Governmental Misconduct," we would have a difficult time prevailing on that theory. The government has unbridled charging discretion. Absent the revelation of some huge *Brady* violation or other truly outrageous conduct (and simply charging you is insufficient) that issue probably does not have legs.

I am making arrangements to have your transcripts copied and mailed to you.

Sincerely,

Suzanne Lee Elliott
Attorney at Law

SLE:wb

Francis S. Cox, #16179-006
USP Marion
PO Box 1000
Marion, IL    62959

Aug. 27th 2013

Law Office of
Mair & Camiel, P.S.
710 Cherry Street
Seattle, Washington    98104

Re: Inadequate Representation by Mrs. Elliott, Case #13-30000
Attachment:  Letter to Mrs. Elliott

Dear Mr. Camiel,

I am writing to you to ask you to take this case back.  I do not believe Mrs. Elliott is able to handle my appeal.  While she is well known as a reputable and competent attorney, my experience with her office has been marked by disorganization and nonperformance.

I have tried for several months to discuss these shortcomings with her in hopes that we could work together.  I have been met with generic dilatory form letters that fail to address anything at all, let alone matters of substance.

I am not bringing into question her abilities as an attorney. In light of her past successes, that argument would fail on its face.  However, I am saying that she has been unable, thus far, to apply those abilities to my case.  This could be caused by any number of reasons, from an excessive case load to a simple lack of interest.

As a successful business owner who has built several companies from nothing, I sympathize with the challenges she is apparently struggling with.  As in other businesses, a skilled and hard working attorney will become well known for such attributes.  As word of a job well done spreads, demand for their services will soon exceed what they are able to handle by themselves.  This is the beginning of a dangerous and difficult transitional stage of business growth. The skilled person, whether a builder or an attorney, must hire additional help and oversee their work.  This moves the skilled person away from performing the skill that made their good name, and into the entirely different skill of business administration and people management, a skill they may or may not possess.

I have seen many business losses suffered in this area by both myself and others.  I know it is not easy.

By all indications Mrs. Elliott has instructed inexperienced office personnel to correspond with me.  These correspondences

Mr. Peter Camiel
August 27, 2013
Page 2

have been disorganized, uninformed placations that demonstrate
a total lack of skill and diligence.  Receipt of letters I have
sent has not been acknowledged, though I have requested it
repeatedly, and some recent questions posed to me suggest they
have not even been read.  Spefific questions I have asked
repeatedly have been met only with evasive answers.  The only
thing I have gotten from Mrs. Elliott's office are a few positively
juvenile explanations of the basic steps of the appellate process
with nothing of specific application to this case.  It is clearly
the work of poorly supervised office plankton.  I am not being
represented by Mrs. Elliott at all but by incompetent persons
working under her name.

I have been where Mrs. Elliott is at many times myself.  So
I'm not mad at her or thinking any less of her.  But given the
complexity of this case, the amount of injustice we have to
correct, and the seriousness of the sentence, I am not able to
willingly proceed with her office as my representation.

If I have no other reasonable choice, I have no other reason-
able choice.  I will keep moving forward, be a courteous and
professional client and try to make her job easier every way I can.
But I will be doing it against my better judgment and by necessity
only.

Peter, I know you must be busy and I know you believe you may
be needed as a witness.  I also know you think very highly of
Suzanne.  But I am asking you to please try to get this case back.
I know there are just as many reasons why not as there are why,
but you possess all of the professional qualities that this case
is screaming for.  You're just a good fit and it would be a shame
to let this one go down as just another bungled miscarriage of
justice.

I really hope you'll do it.

Thanks,

Schaeffer

Mailed 8-13-13

                              Francis S. Cox
                              USP Marion
                              PO BOX 1000
                        Marion, IL    62959

                                           August 12, 2013

Law Office of
Suzanne Lee Elliott
1300 Hoge Building
705 Second Avenue
Seattle, WA    98104

                    Re:    Adequate Representation

Dear Suzanne,

     I am writing to try to resolve some concerns I have about the
effectiveness of your representation.  Let me be quick to say that
when I met you in Seatac I liked you.  Also I have found no reason
to dislike you since.  However, in spite of me liking you personally,
there are some issues that I believe objectively warrant addressing.
It is not my intent to offend you or put undue strain on our attorney
client relationship.  I am approaching this with a very dispassionate
attitude.  It is my hope that both of us can carry ourselves with a
high degree of matter-of-fact professionalism in addressing these
concerns.

     Of primary concern to me is the near total lack of communication
over the past 8 months and the apparent lack of progress on the case.

     I have sent several letters and emails asking for your counsel
on immediately relevant issues.  To date, none of those questions
have been answered.  These questions ranged from whether I should
take advantage of mental health services, to whether I should file a
grievance over my placement in the Communications Management Unit.  I
do not even know for sure if you have received any of my letters.

     The CMU is presently the subject of some fierce litigation over
their practice of blocking attorney client communications.  In light
of this unique unit and its somewhat dubious policies, it would seem a
matter of course that your office acknowledge receipt of my corres-
pondence as I have repeatedly requested them to do so.  I have
included an index of the dates of unanswered letters I have sent over
the past several months.

     As to what appears to be a lack of progress on the case, it is
my understanding that there was some difficulty obtaining a properly
prepared trial transcript that had to be resolved through motion
practice in the 9th Circuit.  Do not think that I do not appreciate
your efforts to secure a usable transcript of trial or how long it
takes to do that.  There is however a great deal of material both

Suzanne Lee Elliott
August 12, 2013
Page 2

from pretrial motions and sentencing that could heve been reviewed
over the last 8 months to give you a feel for the major issues of
the case.

The cover letters from your office attached to the motions
regarding production of transcripts that I received gave no indication
that any material had been reviewed or strategy formed.  This would
not normally be of great concern to me but given the length of time
that has elapsed since you entered the case, it does seem unacceptable.

I'm in no position to tell you how to run your practice.  Every-
one has their own methods and after 30 plus years of experience I'm
sure you do as well.  But of the dozen or so attorneys I have worked
with over the course of this ordeal, all of them, with the notable
exception of Mr. Traverso, have answered their mail, their phone and
any questions posed.

Mr. Camiel made steady progress and kept me apprised of his work.
He also was quick to supply me with the documents I needed to assist
him as he familiarized himself with this bizarre and complex case.  I
was able to see his sentencing memo take shape and slowly and
thoughtfully be formed into the final product.  He solicited my input
along the way.  Some of the points of fact I raised he included,
others he did not.  But he was not haphazard about it and his finished
submission was highly professional.

Mr. Traverso in contrast simply reassured me that he was the
trained attorney and that he would pull a rabbit out of his hat when
the time came.  He never delivered and I was convicted of a crime I
didn't commit.  There is black and white exculpatory evidence that Mr.
Traverso simply failed to prepare and present.

I can't imagine that your office could possibly be as incompetently
discombobulated as Mr. Traverso's but MY experience thus far is that
your office is well below the standard of all the other attorneys I
have dealt with.  Your name is highly respected by several attorneys I
hold in high regard, which is why I am trying to address what I see as
deficiencies, rather than immediately seek new counsel.  It is my hope
that you will enlighten me as to the cause of the problem.

What I am not willing to do is continue with things as they have
been since you entered the case.  Please do not take offense at my
saying that.  Just please try to understand that it would be irrespon-
sible for me to blindly proceed in the absense of   substantive
communication and tangible verification of progress.

Suzanne Lee Elliott
August 12, 2013
Page 3

As a builder of high-end custom homes could I expect my clients
to find it acceptable if I were to tell them "I'll call you when your
house is done. I promise you'll love it," and then leave them in the
dark? I can build a stunning and elegant home and I'm sure you can
write a brilliant and powerful brief. But the fact remains that it's
just bad business to proceed into major undertakings in the dark.

I have been in the dark for the past 8 months. If we can change
that and proceed in a way I am comfortable with, that is my preference.
If not, I would ask that you withdraw from the case. I will not be
offended if that is what you need to do. Like I said, everyone's
approach is different. You could surprise me by being silent and aloof
then producing a great brief just in the nick of time, but I'm not
willing to take a chance on it. I'd be gambling with my family's
future. I can't do that. They depend on me and need me back. I
don't care how slow we have to go to do things right. A lot of
mistakes were made and justice miscarried at trial because things
weren't done right. Your office not communicating or showing regular
progress is just too far removed from the standard practices of other
attorneys. I am only comfortable with proceeding if these adjustments
can be made. Is that something you would be willing to do?

Please make every effort to reply before August 26th 2013.

With patience and kindness,

F.A. Schaeffer Cox

cc: File

Index of letters sent to Suzanne Elliott:

April 23rd
May 1st (request receipt)
May 20th (copy of email from 5-1 snailmailed)
May 21st (written consent to talk to family)
August 2nd

TRULINCS  16179006 - COX, FRANCIS SCHAEFFE - Unit: MAR-!-A

----------------------------------------------------------------------------------

FROM: 16179006
TO: Cox, Grady; Cox, Jennifer; Cox, Mair; Cox, Marti
SUBJECT: RE: Letter
DATE: 08/04/2013 05:56:18 PM

Mom and Fam, (KEEP A COPY)

I did get a package from Suzanne. She sent me the wrong memo and the rest of it was real general. She still has not answered any of my questions about anything. I have asked her about mental health stuff and appointed counsel for the 2255 and a dozen other things. I just get the same boiler plate put off form letter back. It is obvious she has not gone over any pretrial motions or other material at all.

I am not saying I think it's good to switch horses but I do see some red flags. She can show no progress in 8 months, something she should be able to do even with out full transcripts. She will not communicate or answer simple questions and her letters are generic put offs. However, she jumps right in with counter attacks if there is any thing said that would imply she is not up to snuff. She tells you to not listen to me and direct me to her. This is what attorneys do when they want to isolate themselves from professional accountability. Nelson did it big time and I don't want to get had again. She tends to defend the system not me and assumes my guilt. This shows a lack of familiarity with the basic facts of the case. She says stuff that is true but not the whole story in her letters designed to mislead me. When she met me in SeaTac I was a quivering traumatized mess and I think she thinks she can snow me with half truths. I have regained my strength since I came to this prison. I am on top of things now. But still she is smug and condescending and her staff is rude.
    Now before you launch in on me let me say that none of this matter AT ALL if she can write good briefs. END OF STORY. But at the same time she is exhibiting some signs of some one who can't. I base this off of my experience with Tim Dooley, Robert John, Rich Kurtner and Peter Camiel. All four of those guys answered their phone answered their mail and answered your questions. They all dug into the case and had questions for ME. Every time I contacted one of them they said what they HAD done. They never gave me a put off letter. She is doing all the stuff that Nelson did and so is her staff. I know this crap inside out because it's the exact same run-around us contractors give home owners when we are lazy and unorganized.

So what do we do? Nothing in haste. What I am going to do is keep copies of every letter I send to her and ask her to send me copies of the letters I sent to her already. (I have all the dates I sent them) I also need you to send me paper copies of all the emails I sent to her. This isn't to bully or piss her off it's so that if she does turn out to not do her job we will have a record. It's just the responsible thing to do to look after our best interests. If she continues to not produce I will send her more letters to establish a record of non performance and then file a motion for new counsel and ask Rich to help again.

Now let me book end all of this by saying that she could be one of the best attorneys in the west, but if she is over extended or just being lazy and wont put out at the level she is capable of, we need some one else. I'm not saying that is for sure the case but her not being at the same level of performance as Peter, Tim, Robert and Rich warrants extra caution on our part. I do not want to piss her off or jump to conclusions. We just need to be smart clients here. Don't buy her "Make every thing go through me" BS mom. That's like a contractor who says "don't talk to any other contractors about my work". If an attorney wont work with others it's usually a sign that they aren't working at all. Nelson and Suzanne are the only ones who pulled that line. All the others were eager to work with family and other attorneys. So don't buy it Mom.

Let me sum up.

1. Don't piss her off (or fwd. her this email)
2. Keep a good record of correspondence just in case
3. Require her to show progress and updates like every other attorney.

I am going to look up and read every case she has ever litigated in the appellate courts and also see if she has ever been found to be ineffective counsel before. I will let you know what I come up with.

Thanks for the money on my books. I was down to $5.

I love you,    -Schaeffer
-----Cox, Jennifer on 8/4/2013 9:01 AM wrote:

>

Did you get a letter from Suzanne in your snail mail?

LAW OFFICE OF
## Suzanne Lee Elliott
1300 HOGE BUILDING
705 SECOND AVENUE
SEATTLE, WASHINGTON 98104

TELEPHONE
(206) 623-0291

FAX
(206) 623-2186

July 23, 2013

Mr. Francis Schaeffer Cox #16179-006
USP MARION
U.S. PENITENTIARY
P.O. BOX 1000
MARION, IL 62959

Dear Schaeffer:

I have received a lengthy email that you sent to your mother, who has forwarded it to me. I'm sorry it's taken me a few days to respond, but you had a lot of questions.

We did mail you a copy of the sentencing memo that you requested. I do not know why you have not received it yet, but enclosed please find another copy. Please note that you *may not* disseminate this document to anyone else.

Rolly Port still has not come through on his promise to send me his files. I am following up with him.

I do not believe that there is some conspiracy between the clerk of the court, the probation office, and the prosecutor regarding the transcripts in your case. I do believe that the court is just being cheap. They do not want to prepare a transcript for the 25 day trial from scratch when they have a number of partial transcripts already transcribed. As you can see from the various filings, we are trying to force them into putting the transcript into some form that is usable.

I do not know how I can get in touch with you on a daily basis by telephone. First of all, no one has written me back about periodic telephone contact. I will make another request.

In regard to some of your other concerns about my reviewing all of the evidence, you have to understand that a <u>direct appeal is based *solely* on the evidence admitted at</u> trial or testified to by the witnesses. If it was not admitted at trial, it is as if it never happened. You cannot take evidence outside of the record and now insert it into the proceedings. An appeal is not like a new trial. It is a judicial review of the events in the trial court to determine if there was any erroneous handling of the trial. Your assertion that we are losing time to file "actual evidence on appeal" is based on a misunderstanding of the law.

I do not believe an appeal to anyone in Washington, DC will assist you.

Please be advised that my plan is to carefully review all of the trial transcripts and all of the exhibits admitted at trial to look for and research any potential issues. I am "working with you" but that does not mean that I can change the rules of appellate procedure. The Ninth Circuit is quite clear that except under the most unusual circumstances, no defendant in a federal criminal prosecution is entitled to have a direct appeal and a 2255 proceeding considered simultaneously in an effort to overturn the same conviction and sentence. See *Jack v. United States*, 435 F.2d 317, 318 (9th Cir. 1970). Thus, to the extent that you do wish to raise claims of ineffective assistance of counsel or bring in matters outside the record, you do actually have to take a wait-and-see attitude. The rules of appellate procedure and the case law are all set up to force the Ninth Circuit to first consider the direct appeal. That has some advantages and disadvantages to you. On the one hand, you get better standards of review on direct appeal. On the other hand, if you don't have any excellent issues that come straight from the record, you have to wait for the 2255 to be decided.

I certainly understand your anxiety being incarcerated where you are and having very little contact with people on the outside. But as I have explained in the past, an appeal can take two years and in some cases takes as many as three years to complete. It is going to take some time to untangle you from this case. I hope that you will remain calm and focused and able to resist the overwhelming paranoia that might come from being so isolated.

I will send you a copy of the complete transcripts as soon as I get them.

Sincerely,

Suzanne Lee Elliott
Attorney at Law

Enclosure
SLE:wh

TRULINCS 16179006 - COX, FRANCIS SCHAEFFE - Unit: MAR-I-A

--------------------------------------------------------------------------------

FROM: 16179006
TO: Browning, Josh; Cox, Gary; Cox, Grady; Cox, Jennifer; Cox, Mair; Cox, Marti; Cox, Nathandavi; Elliott, Suzanne
SUBJECT: Word from Sue?
DATE: 07/21/2013 01:21:20 PM

Hi every one,         7-21-13

   I don't know what's up with no one hearing from Suzanne Elliot. I heard from Peter every week when he was my attorney. But I was also in SeaTac and could call him. I would at least like her to acknowledge that she is getting my letters and emails. I don't know if they are blocked or if she's just not reading them or what. I asked her some very important questions and haven't gotten any answers. I only send her something once a month or so so it's not like I'm hounding. I just need her guidance on a few things.
   I know she is limited to the official trial record on direct appeal so that cuts down on my involvement. Also if she hasn't gotten the transcript she may not have anything to say until after she reads it. I could understand that. Maybe she is afraid the BOP is opening her mail. Maybe she is working on another case. Who knows? But those are all things she could just tell us and that would be fine. This total aloof silence is unprofessional. Though it may not be her. Some times an attorney will have a receptionist who keeps clients at arms length so the attorney can work. I just don't know.

   Mom, will you call Peter and ask him if he knows what's going on with Suzanne? Also if you send or fwrd Suzanne any emails send them to Suzanne@suzanneelliotlaw not Info@suzanneelliotlaw.

   I just want to know what she has done so far and if she thinks she can get this straightened out. She ought to have a pretty good idea by now. And for sure she should after she reads the trial transcript.

   You guys may want to ask RJ if this is normal for a Federal appeal. He's a good man and knows his stuff. Find out if he will be in his office at 3pm or 4pm on a Thursday and I will call him.

   Thanks,

   -Schaeffer

Supplemental Exhibit

Part 3(D)

## Case Law Relevant to State of Mind Evidence

1. <u>Lahoti v. Vericheck, Inc.</u>, 636 F.3d 501 (9th Cir. 2011)

2. <u>Conversive, Inc. v. Conversagent</u>, 433 F.Supp.2d 1079,1091 (C.D.Cal. 2006)

3. <u>Wagner v. Co. of Maricopa</u>, 706 F.3d 942 (9th Cir. 2011)

4. <u>U.S. v. Leonard-Allen</u>, 724 F.3d 780, 785-787 (7th Cir. 2013)

5. <u>U.S. v. Fitzsimmons</u>, 2011 U.S.Dist. LEXIS 135017 (D.C. Org. Nov. 22, 2011)